## Page 1

```
 1        IN THE SUPERIOR COURT
 2      FOR THE DISTRICT OF COLUMBIA
 3   - - - - - - - - - - - - - - - - - - -
 4   KEVIN PATRICK BAKER,        :
 5        Plaintiff              :
 6   v.                          :
 7   ALSTOM TRANSPORTATION, INC., :
 8   et al.              : Case No.:
 9        Defendants    : 05-0002968
10   - - - - - - - - - - - - - - - - - - -
11
12        Deposition of KEVIN BAKER
13           Baltimore, Maryland
14       Wednesday, September 28, 2005
15                9:40 a.m.
16
17
18
19   Job No: 1-64286
20   Pages: 1 - 265
21   Reported by: Pamela S. Lehmann
22
```

## Page 2

```
 1        Deposition of KEVIN BAKER, held at the offices
 2   of:
 3
 4        Ober, Kaler, Grimes & Shriver
 5        120 East Baltimore Street
 6        9th Floor
 7        Baltimore, Maryland 21202-1643
 8        (410) 685-1120
 9
10        Pursuant to agreement, before Pamela S.
11   Lehmann, Court Reporter and Notary Public for the
12   State of Maryland.
```

## Page 3

```
 1              APPEARANCES
 2   ON BEHALF OF THE PLAINTIFF:
 3        ALAN BANOV, ESQUIRE
 4        Alan Banov and Associates
 5        1819 L Street, N.W.
 6        Suite 700
 7        Washington, D.C. 20036-3830
 8        (202) 822-9699
 9
10   ON BEHALF OF THE DEFENDANTS:
11        NEIL E. DUKE, ESQUIRE
12        Ober, Kaler, Grimes & Shriver
13        120 East Baltimore Street
14        Baltimore, Maryland 21202-1643
15        (410) 685-1120
```

## Page 4

```
 1                CONTENTS
 2        DEPOSITION OF KEVIN BAKER
 3           September 28, 2005
 4   EXAMINATION BY:              PAGE
 5   MR. DUKE                    6, 252
 6   MR. BANOV                     234
 7
 8              EXHIBITS
 9        (Attached to the transcript.)
10   BAKER DEPOSITION EXHIBIT:        PAGE MARKED
11   No. 1   course description       56
12   No. 2   course description       91
13   No. 3   application             128
14   No. 4   letter                  135
15   No. 5   job posting             143
16   No. 6   personnel document      152
17   No. 7   letter 5/1/03           175
18   No. 8   letter 4/04             184
19   No. 9   job audit 12/18/03      189
20   No. 10  letter 6/28/04          205
21   No. 11  performance objectives  207
22   No. 12  performance objectives  211
```

EXHIBIT 1

69
1  transferred into an engineering group where we
2  designed and maintained the test equipment that the
3  production test technicians would utilize.
4      Q.  Did you secure this position as a direct
5  hire or through an agency?
6      A.  I was -- no, I was never employed
7  directly -- Lockheed Martin.  I was there for a
8  total of -- while it was Lockheed Martin, almost two
9  years.  I don't remember exactly.
10     Q.  So we're talking about '97 to '99 roughly?
11     A.  Yes.  I actually was working there and BG
12 Labs for a short while.
13     Q.  I'm sorry.  BG Labs after --
14     A.  No.  I was working at the same --
15     Q.  Oh I see.
16     A.  One part time and the other full time.
17     Q.  I see.
18     A.  BG Labs was not always full time, '97
19 through '99 I worked with Lockheed Martin.
20     Q.  Got ya.  Were you compensated as an hourly
21 employee or --
22     A.  I was always hourly, whether as -- in

70
1  either of the positions.
2      Q.  Did the position that you secured with
3  Lockheed Martin require any formalized educational
4  training, such as a bachelor's degree?
5      A.  Did not.
6          MR. BANOV:  Objection.  Relevance.  Go
7  ahead.
8          THE WITNESS:  No.
9  BY MR. DUKE:
10     Q.  Did your course of employment with BG Labs
11 require your having a bachelor's degree?
12         MR. BANOV:  Objection.  Relevance.  Go
13 ahead?
14         THE WITNESS:  No.
15 BY MR. DUKE:
16     Q.  Did any of the prior courses of employment
17 that you've referenced thus far this morning require
18 that you have a bachelor's degree?
19     A.  No.
20         MR. BANOV:  Objection.  Relevance.  Go
21 ahead.
22 BY MR. DUKE:

71
1      Q.  So we're in the 1999 time frame.  You've
2  been employed by Lockheed Martin.  Where did you
3  secure employment afterwards?
4      A.  Alstom.  Through an agency, on March 6th,
5  2000.  Through Tech Aid (phonetic).
6      Q.  Now I am familiar with your course of
7  employment with Alstom.  I believe that ran roughly
8  from the calendar year of 2000 as you've described
9  until 2004 if I'm not mistaken, correct?
10     A.  Yes.
11     Q.  Where are you presently employed?
12     A.  SAIC.
13     Q.  And where is that located?
14     A.  It's Science Applications International
15 Corporation and the corporate headquarters are in
16 San Diego.  However, the east coast headquarters is
17 in Vienna, Virginia.
18     Q.  And what do you do for them?
19     A.  I'm an electric -- electromechanical
20 technician in research and development at the Army
21 Research Lab in Adelphi, Maryland.
22     Q.  How long have you worked for SAIC?

72
1      A.  One year.
2      Q.  And how did you secure your position
3  there?
4          MR. BANOV:  Objection.  Relevance.  Go
5  ahead.
6  BY MR. DUKE:
7      Q.  Was it as a direct hire or through an
8  agency?
9      A.  A direct hire.
10     Q.  And how much are you compensated?
11     A.  Thirty-two dollars and 74 cents an hour.
12 Excuse me, I think I misspoke.  What did I say?
13     Q.  Thirty-two, seventy-four.
14     A.  Thirty-one, seventy-four.  Excuse me.
15     Q.  Was this the initial offering, salary
16 offering they provided you or have you received
17 increases since you started?
18     A.  I received one increase of -- which
19 amounted to about a thousand dollars a year.  I
20 started at $31.25 which is exactly $65,000 per year.
21 And a 2,080 hour work week -- or work year.
22     Q.  Two thousand?

Page 73

1   A.  Two thousand eighty hours, it would be
2   exactly $65,000.  And I received -- roughly it was a
3   49 cent raise per hour, so it's now $31.74.
4       Q.  You testified that you were -- that you
5   are presently an electrical, mechanical technician
6   in research and development.  How did you come to
7   learn of the vacancy or position?  Was this through
8   the want ads, job fair?
9       A.  Monster dot com.
10      Q.  It works occasionally.
11      A.  I actually was interviewed by two
12  different companies at the same -- the building on
13  the same research facility from Monster.  So yes, it
14  does work as a side bar, I guess.
15      Q.  Supervisors there, are you supervised?
16          MR. BANOV:  Objection.  Relevance.
17  BY MR. DUKE:
18      Q.  And do you know the name of your
19  supervisor?
20          MR. BANOV:  Go ahead.
21          THE WITNESS:  I have several supervisors,
22  yes, I am supervised.

Page 74

1   BY MR. DUKE:
2       Q.  And the names of your supervisors?
3           MR. BANOV:  Objection.  Relevance.  Go
4   ahead.
5           THE WITNESS:  My manager is David Barrett,
6   two Rs, two Ts.  I am supervised by different
7   engineers or physicists, people with advanced
8   degrees, Masters and PhDs.  Depending on the needs
9   of the day or the hour or the week or the project.
10  So I could name them all if you care.  There's a few
11  of them.
12  BY MR. DUKE:
13      Q.  No.  As much -- that's more than
14  sufficient.  I appreciate the information, the
15  background information.  The location you've already
16  shared with me, Adelphi, Maryland.  What is the work
17  number there for the company?
18          MR. BANOV:  Objection.  Relevance.  Go
19  ahead.
20          THE WITNESS:  My number is 301-394-1867.
21  My manager's number is off site.  He just recently
22  moved to a new facility.  If that's what you're

Page 75

1   seeking.
2   BY MR. DUKE:
3       Q.  The -- you've testified that you found the
4   job through the internet site, Monster dot com.
5   When you actually accessed the site, was there a job
6   posting?  Or what was the form of the notice or
7   announcement of a position vacancy?
8           MR. BANOV:  Objection.  Relevance.  Go
9   ahead.
10          THE WITNESS:  Yeah.  I just did a search
11  for technicians and electronics, engineering.  I did
12  a multi-faceted search and came up with numerous
13  jobs.  Looked at hundreds of jobs.  And it was one
14  of them that I felt that I qualified for.
15  BY MR. DUKE:
16      Q.  Have you ever seen a formal vacancy
17  announcement associated with the position you
18  eventually secured with your present company?
19          MR. BANOV:  Objection.  Relevance.
20          THE WITNESS:  I'm not really certain that
21  that's -- I saw the posting on Monster.  I've not --
22  I've seen a similar vacancy postings with internal

Page 76

1   to SAIC since being hired.  But I didn't see a --
2   other than what was posted on Monster prior to being
3   hired.
4   BY MR. DUKE:
5       Q.  The position that you're presently in,
6   does it require a bachelor's degree?
7       A.  No.
8       Q.  Was this the first position that you
9   secured subsequent to Alstom or was there another
10  job in between the time that you --
11      A.  No.
12      Q.  -- left Alstom?  I had referenced before
13  the fact that my recollection if it serves me
14  correctly that you parted with Alstom in calendar
15  year 2004.  How long did it take you to secure your
16  position with SAIC?
17      A.  I left Alstom, my last day of work was 22
18  June, 2004.  Officially I was terminated the 28th of
19  June.  I started with SAIC on the 13th of September,
20  2004.
21      Q.  And in the interim between that gap in
22  time, I'm assuming you weren't employed.  What did

**Page 77**

1  you do for compensation? Did you apply for
2  unemployment?
3      MR. BANOV: Objection. Relevance.
4  BY MR. DUKE:
5      Q. I'm sorry. I missed your answer.
6      A. You previously asked me if I was -- maybe
7  I misunderstood the question. But you previously
8  asked me if there was any other employment in
9  between and I'm not sure exactly how I answered it.
10 And -- but I was and am still employed with Amtrak.
11 I was hired on the 1st of September, 2004 at Amtrak.
12     Q. Do you work there on a part-time basis?
13     A. No. Actually I'm full time at both jobs.
14     Q. Now the obvious question is how do you
15 juggle that? What are the time frames that you have
16 to work within, your schedule, that is?
17     A. You went to college, you know, how it is.
18     Q. One, one place in the morning and one
19 place in the evening?
20     A. Yes. I work from -- I have a flexible
21 work schedule, my core hours at SAIC are between ten
22 and two. I can arrive no later than ten and leave

**Page 78**

1  no earlier than two. So it's -- I don't punch a
2  clock. I'm on the honor system. I put in eight
3  hours. I'm not required to take a lunch hour. They
4  frown upon it, not taking one.
5      So when I get home from that I go to bed.
6  I get up and go to work at Amtrak at eleven o'clock
7  and I leave before seven.
8      Q. And just for the clarity of the record,
9  eleven p.m. is when you start --
10     A. Eleven p.m. I start at eleven p.m. And I
11 can leave before seven o'clock.
12     Q. How did you secure the position with
13 Amtrak?
14     MR. BANOV: Objection. Relevance. Go
15 ahead.
16 BY MR. DUKE:
17     Q. My apologies. Direct hire or through a
18 temp agency?
19     A. Direct.
20     Q. And what is the job title that you have
21 with Amtrak?
22     A. Electrician.

**Page 79**

1      Q. And are you paid on a hourly or salaried
2  basis with Amtrak?
3      A. Hourly.
4      Q. And where is your office located -- your
5  work station, I should say, located for Amtrak?
6      A. In the District of Columbia. Is that --
7  do you mean what city am I working at or --
8      (Discussion off the record.)
9  BY MR. DUKE:
10     Q. The street location for Amtrak where
11 you're working presently?
12     A. 1401 W Street, Northeast. Washington, DC.
13 I don't recall the zip code.
14     Q. No. That's fine. How did you learn about
15 the opportunity with Amtrak?
16     MR. BANOV: Objection. Relevance.
17     THE WITNESS: It's on the same premises I
18 worked at when I was with Alstom. And I knew a lot
19 of people that I presently work with. So I --
20 basically I just sent a resume to human resources
21 and they called me. And -- just like anybody else
22 off the street. And I just happen to know people.

**Page 80**

1  I guess they call that networking.
2  BY MR. DUKE:
3      Q. Did you utilize anyone from Alstom as a
4  job reference for either your position with Amtrak
5  or SAIC?
6      MR. BANOV: Objection. Relevance. Go
7  ahead.
8      THE WITNESS: With Amtrak I believe I did.
9  I don't recall with SAIC who I put down as
10 references. I -- it may have very well have put --
11 I know I put at least one person for Amtrak and with
12 SAIC perhaps the same person. But I don't recall.
13 BY MR. DUKE:
14     Q. I don't think I've asked you --
15     A. I have electronic versions of my
16 applications so -- you know, resumes. So I'd have
17 to take a look at that.
18     Q. I don't believe I've asked you as yet your
19 salary with Amtrak.
20     A. Presently it's $19.57 an hour plus a 50
21 cent -- plus 50 cents an hour pay differential.
22 It's like a -- they -- it's like a shift

Page 81

1  differential or something but it's not -- I forget
2  exactly what they call it. I get an extra. So it's
3  a total of $20.07 an hour.
4     Q. Were you required to possess a bachelor's
5  degree or --
6     A. No.
7     Q. Just for the sake of the record I'll just
8  finish the question and then I'll have you respond
9  again.
10    A. Sorry.
11    Q. That's quite okay.
12    A. I thought you were done.
13    Q. We'll do that through the course of the
14 day. As a part of your position or application for
15 the position with Amtrak, were you required to
16 possess a bachelor's degree? And your answer was?
17    A. No.
18    Q. Have I missed any other positions
19 subsequent to Alstom besides Amtrak and SAIC?
20    A. No. However, if I recall correctly, you
21 did ask a question which I probably didn't
22 completely answer. And that was eluding to, well,

Page 82

1  if I wasn't employed, how, you know, did I get by,
2  something of that nature. Of course, I was on
3  unemployment for two months. I received
4  unemployment compensation from the District of
5  Columbia, worker's compensation for, you know,
6  unemployment. I think I received seven or eight
7  weeks, something of that nature.
8     Q. Was it contested at all by Alstom, if you
9  recall?
10    A. Yes. The short answer is yes.
11    Q. Did you have to appear for any hearings or
12 formal --
13    A. The short answer is no. I didn't have to
14 appear. To be more specific I did have -- there was
15 an appeal process. However it was done
16 completely -- everything's over the phone for the
17 most part with the unemployment nowadays. You don't
18 have to go there. So it was by fax and by phone.
19       After -- well, I'll let you ask a question
20 before I answer.
21    Q. No. That's quite okay, I appreciate that.
22 Do you recall any of the personnel that you would

Page 83

1  have had dealings with, with unemployment
2  compensation --
3        MR. BANOV: Objection. Relevance. There
4  is no discharge claim in this case. This is all
5  irrelevant.
6        THE WITNESS: Yes. But I can't think of
7  the gentleman's name. Oh Mr. Blackman (phonetic) or
8  Blackwell (phonetic) was the gentleman's name that I
9  dealt with at the district.
10 BY MR. DUKE:
11    Q. And the reason I ask the question, I'm
12 sure you're aware of the nature of your complaint
13 against Alstom, specifically regarding the alleged
14 violations of the Federal Labor -- Fair Labor
15 Standard Act?
16    A. Excuse me? I don't understand. Is that a
17 question?
18    Q. It's more so of a characterization of your
19 complaint. I'm sure you're familiar with the nature
20 of your complaint against Alstom, namely the issues
21 involving the payment or the non-payment of overtime
22 compensation with respect to your employment with

Page 84

1  Alstom, correct?
2     A. Yes.
3     Q. And I was asking you some questions
4  regarding your interaction with unemployment
5  compensation agency for DC. To the extent that you
6  recall any communications with Mr. Blackman or
7  Blackwell or any of the other individuals employed
8  there regarding your complaints against Alstom --
9  about Alstom with respect to overtime compensation,
10 do you recall having any conversation with Mr.
11 Blackwell or Blackman or anyone from DC unemployment
12 compensation regarding the payment or non-payment of
13 overtime compensation?
14       MR. BANOV: Objection. Relevance.
15       THE WITNESS: No. I do not recall
16 discussing that matter --
17 BY MR. DUKE:
18    Q. Have you had any --
19    A. -- with them.
20    Q. I'm sorry.
21    A. I'm just being a little bit more specific
22 in my answer.

# OBER|KALER
A Professional Corporation

Ober, Kaler, Grimes & Shriver
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

Neil E. Duke
neduke@ober.com
410-347-7398

Offices In
Maryland
Washington, D.C.
Virginia

October 13, 2005

**VIA FACSIMILE AND U.S. MAIL**
Alan Banov, Esquire
Norberto Salinas, Esquire
Alan Banov and Associates
1819 L. Street, N.W., Suite 700
Washington, D.C. 20036-3830

   Re: Kevin Patrick Baker v. ALSTOM Transportation Inc.
     *Civil Action No.05-CV-1352(RSL)*

Dear Counsel:

  During the course of Mr. Baker's deposition he offered testimony regarding the companies that he has worked for since being employed by ALSTOM. Specifically, Mr. Baker stated that he began working for SAIC on September 13, 2004, and for AMTRAK on September 1, 2004. It is my understanding that Mr. Baker's work site for his job with SAIC is located in either Vienna, Virginia or Adelphi, Maryland. Mr. Baker's position with AMTRAK is supposedly located at 1401 W. Street, N.E., Washington, D.C. I would like to confirm the proper mailing addresses for both entities for the purpose of serving subpoenas. As such, could you please confirm the proper mailing address for both companies at your earliest opportunity. Additionally, if Mr. Baker has worked in any other position subsequent to his job with ALSTOM, please provide me with the proper mailing addresses for those companies as well. Your prompt response will be greatly appreciated.

              Very truly yours,

              Neil E. Duke

NED/cks
cc: Pamela J. White, Esquire

774409.1

EXHIBIT 2

TOTAL P.02

# ALAN BANOV AND ASSOCIATES

ALAN BANOV
Admitted in the District of Columbia and Maryland

October 17, 2005

NORBERTO SALINAS
Admitted in the District of Columbia and Michigan

MARIA BREMIS
Admitted in the District of Columbia and Maryland

<u>By Facsimile Transmission (410-547-0699) and by Mail</u>
Pamela J. White, Esq.
Neil E. Duke, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

      Re:  <u>Kevin Patrick Baker v. ALSTOM Transportation, Inc.</u>
           Case No. 05-CV-1352 (RSL) (D.D.C.)

Dear Ms. White and Mr. Duke:

    This is in response to your letter of October 13, 2005, asking us to verify the addresses of Kevin Baker's current employers, so you can issue subpoenas to those companies.

    While Mr. Baker has nothing to hide, we fail to see any possible legitimate value in subpoenaing any records from Mr. Baker's current employers. As you know, in this case Mr. Baker does claim a wrongful discharge, so whatever income he made after his termination from ALSTOM is irrelevant to any claims or defenses in this case. Nor would there be any relevance in the way he is classified by other employers. In short, we cannot imagine how such subpoenas could possibly produce any documents which are relevant to any claims or defenses in this case or which could possibly lead to the discovery of admissible evidence.

    On the other hand, we can readily anticipate that such subpoenas would embarrass and harass our client. There is no need for his current employers to know that he is suing a former employer for overtime backpay. Subpoenas to them could very well produce reprisal against him, or at least a new, unfavorable perspective on this relatively new employee.

    We urge you not to issue subpoenas to Mr. Baker's current employers. If you do not agree, tomorrow we will file a motion for a protective order. We do not want to make you appear obnoxious to the Court, but if we must file such a motion, we will need to seek sanctions for having to file it. And, if you nonetheless issue the subpoenas before the Court rules on our motion, we will move to quash them.

    We will appreciate your cooperation in this matter.

                                          Sincerely,

                                          Alan Banov

AB/sf
cc: Mr. Kevin Baker


EXHIBIT 3

WWW.BANOVLAW.COM
1819 L STREET, N.W., SUITE 700    202.822.9699
WASHINGTON, D.C. 20036-3830    202.842.9331 FAX

Letter to Pamela J. White, Esq.
Re:   Kevin Patrick Baker v. ALSTOM Transportation, Inc.
October 17, 2005
Page 2

    b)    The official or representative of ALSTOM who knows the most about the number of hours worked by plaintiff and overtime which defendant allegedly suffered or permitted him to perform.

    Please let us know this week what dates and times are most convenient to you and your witnesses. It would also be helpful if you would disclose the identity of these witnesses in advance. It will save us time in the depositions.

    We will appreciate your cooperation in this matter.

                                    Sincerely,

                                    Alan Banov

AB/sf
cc:  Mr. Kevin Baker

**Alan Banov**

| | |
|---|---|
| **From:** | Duke, Neil E. [neduke@ober.com] |
| **Sent:** | Monday, October 17, 2005 6:23 PM |
| **To:** | ab@banovlaw.com |
| **Cc:** | salinas@banovlaw.com; White, Pamela |
| **Subject:** | Re: Kevin Baker |

Dear Counsel: I am in receipt of your various recent correspondence. Be advised that each will be responded to in appropriate fashion.

Neil E. Duke
410-347-7398
neduke@ober.com

OBER | KALER
*Attorneys at Law*
www.ober.com
410-547-0699 -- Fax
120 East Baltimore Street
Baltimore, Maryland 21202


EXHIBIT 4

10/24/2005

# ALAN BANOV AND ASSOCIATES

ALAN BANOV
Admitted in the District of Columbia and Maryland

NORBERTO SALINAS
Admitted in the District of Columbia and Michigan

October 20, 2005

MARIA BREMIS
Admitted in the District of Columbia and Maryland

<u>By Facsimile Transmission (410-547-0699) and by Mail</u>
Pamela J. White, Esq.
Neil E. Duke, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re: <u>Kevin Patrick Baker v. ALSTOM Transportation, Inc.</u>
Case No. 05-CV-1352 (RSL) (D.D.C.)

Dear Ms. White and Mr. Duke:

On Monday, October 17, we sent you three letters. This is a follow-up to our letter objecting to your intention to issue subpoenas duces tecum to Kevin Baker's current employers.

At the end we asked that you agree not to issue subpoenas to Mr. Baker's current employers and stated that if the next day you did not give us the assurance you would not do so, we would file a motion for a protective order with the Court.

Later that day Mr. Duke responded to our letters in an e-mail stating: "Be advised that each will be responded to in appropriate fashion."

We have not received any substantive response to any of our letters, including the letter regarding the subpoenas duces tecum. As I said in our last letter, it is not our intention to make you look bad, but we cannot conceive of any valid, non-harassing reason for you to subpoena Mr. Baker's current employers, so if tomorrow you will not promise us that you will not issue such subpoenas, on Monday we will be obliged to file a motion for protective order to prevent such subpoenas and explain to the Court that you are engaging in vindictive warfare against our client.

We will appreciate your cooperation in this matter.

Sincerely,

Alan Banov

AB/sf
cc: Mr. Kevin Baker


EXHIBIT 5

WWW.BANOVLAW.COM
1819 L STREET, N.W., SUITE 700      202.822.9699
WASHINGTON, D.C. 20036-3830         202.842.9331 FAX

# OBER|KALER
A Professional Corporation

Ober, Kaler, Grimes & Shriver
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

Neil E. Duke
neduke@ober.com
410-347-7398

Offices In
Maryland
Washington, D.C.
Virginia

October 21, 2005

**VIA FACSIMILE AND U.S. MAIL**
Alan Banov, Esquire
Norberto Salinas, Esquire
Alan Banov and Associates
1819 L. Street, N.W., Suite 700
Washington, D.C. 20036-3830

Re:  Kevin Patrick Baker v. ALSTOM Transportation Inc.
     Civil Action No.05-CV-1352(RSL)

Dear Counsel:

This correspondence is in response to your letter, dated October 17th. ALSTOM hired Mr. Baker as an Electrical Engineer and advised him that his position was exempt from overtime compensation. This fact is beyond dispute. There were certain requirements for the position of Electrical Engineer. ALSTOM's job posting for the position of Electrical Engineer advertised that the *required* "Education and Training" for the position was a "Bachelor's or higher degree in Electrical, Electronic, or other appropriate engineering field" and that a *desired* competency was a "BS in Electrical/Mechanical Engineering." *See* ALS 0022. During his application process, Mr. Baker represented under oath that he held a bachelor's degree in Electrical Engineering from SUNY Binghamton.[1]  *See* ALS 0023 – 0025. ALSTOM relied upon Mr. Baker's representations. Even after Mr. Baker was hired, he continued to represent to his colleagues that he held a bachelor's degree. These instances have been identified to you and do not bear repeating.

Notwithstanding these facts, Mr. Baker has adopted the position that he never held a bachelor's degree in support of his contention that he was improperly classified as an exempt employee and, thus, owed overtime compensation. The issues of Mr. Baker's educational background and his representations regarding his academic pedigree are relevant in this case. Your own discovery requests confirm these points.

ALSTOM will continue to examine how Mr. Baker has represented his educational background to ALSTOM, and other parties, including all of his present and prospective employers through discovery. I will proceed to subpoena his employment records and will send you copies of the production. The relevancy of such documents is apparent on the face of

---
[1] I am still awaiting your production of Mr. Baker's college transcript.
774693.2


EXHIBIT 6

OBER|KALER
A Professional Corporation

Alan Banov, Esquire
October 21, 2005
Page 2

Plaintiff's Complaint and the Answer. It is disappointing that you rejected my good faith efforts and your protests are insincere.

Very truly yours,

Neil E. Duke

NED/cks
cc: Pamela J. White, Esquire

774693.2