**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEVIN PATRICK BAKER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil File No.: 05-CV-1352(RCL) |
| | ) | |
| ALSTOM TRANSPORTATION INC. | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT**</u>
<u>**OF SUMMARY JUDGMENT**</u>

Defendant, ALSTOM Transportation Inc., by its counsel, Ober, Kaler, Grimes & Shriver, A Professional Corporation, pursuant to the Court's *Scheduling Order* and Fed.R.Civ.P., Rule 56, hereby files its *Memorandum of Law in Support of Motion for Summary Judgment* and states the following in support thereof:

**I.      SUMMARY OF ARGUMENT**

Between April 2002 and his dismissal in June 2004, Plaintiff, Kevin Patrick Baker ("Mr. Baker"), was employed by ALSTOM and worked as a professional Electrical Engineer having diagnostic responsibilities for AMTRAK's locomotives based at Washington, DC.  Mr. Baker complains that he should have been paid overtime for hours he worked beyond a 40-hour workweek.  However, Mr. Baker's own testimony and the nature of his professional responsibilities establish that he was exempt from overtime compensation.  Nor can Mr. Baker rationally rely on the fact of his own resume fraud beginning in 2000 to deny that ALSTOM properly engaged and used him as a degreed professional Electrical Engineer.

Section 207 of the Fair Labor Standard Act ("FLSA"), generally requires overtime compensation to employees "for their work in excess of those forty hours at a rate not less than one and one-half times the regular rate at which [they are] employed." 29 U.S.C. 207(a)(2). However, Section 213 of the FLSA specifically exempts Mr. Baker from 'the provisions of Section 207' because he was an "employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. §213(a). Mr. Baker's work for ALSTOM satisfied the FLSA regulations' two-prong test to determine whether an individual, like Mr. Baker, who earned more than $250.00 per week, was employed in a bona fide executive, administrative, or professional capacity for purposes of Section 213. Specifically, employees (a) who are compensated on a salary or fee basis at a rate of at least $250.00 per week, (b) whose "primary duty consists of the performance of . . . work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study . . .," and whose duties require "the constant exercise of discretion and judgment, . . ." are deemed to be employed in a bona fide professional capacity for purposes of Section 213.

As an ALSTOM Electrical Engineer, Mr. Baker's salary exceeded $55,000.00 annually and $2,000 bi-weekly.[1] Second, Mr. Baker's primary duties necessarily and sufficiently satisfied the advanced knowledge prong of the professional capacity test. 29 C.F.R. §541.3(a)(1), 29 C.F.R. §541.3(e), 29 C.F.R. §541(e)(1). Mr. Baker was responsible for coordinating and providing technical services for high-speed trains, repairing anomalies and utilizing complex tools to perform maintenance services of AMTRAK trains. The necessary qualifications for Mr. Baker's Electrical Engineer

---

[1] After May 1, 2003, Mr. Baker's annual salary was $59,854, or just more than $1,150 weekly.

position included a bachelor of science degree in Electrical Engineering, and five years of relevant professional experience. *See infra, Statement of Relevant and Undisputed Facts*, at ¶¶ 3, 13; *see also* **Exhibit B**. Mr. Baker, in fact, represented that he possessed such qualifications, when he applied in 2000 and was considered for the position largely due to his representations. Third, Mr. Baker admits that, as an ALSTOM Electrical Engineer, he was required to exercise independent judgment. *See infra, Statement of Relevant and Undisputed Facts*, at ¶ 13; *see also* **Exhibits G and H**.

In sum, the undisputed facts in this matter demonstrate that Mr. Baker was employed in a bona fide professional capacity exempt from the overtime compensation provisions of Section 207. Accordingly, ALSTOM is entitled to summary judgment as a matter of law.

## II.     STATEMENT OF RELEVANT PROCEDURAL HISTORY

1.     On April 18, 2005, Mr. Baker filed a *Complaint* for damages and request for jury trial in the Superior Court for the District of Columbia, Civil Division. The single cause of action alleged in Mr. Baker's *Complaint* was his claim for unpaid overtime compensation.[2] *See Plaintiff's Complaint*, at ¶¶ 50 - 58.

2.     A subpoena and service copy of Mr. Baker's *Complaint* was first received by ALSTOM's agent for service of process on June 17, 2005.

3.     On July 7, 2005, ALSTOM  filed a *Notice of Removal*, pursuant to 28 U.S.C. § 1446(b).

---

[2] The sole claim alleged by Mr. Baker in his *Complaint* is that ALSTOM misclassified him as an overtime exempt employee and, thus, violated the FLSA by not paying him overtime compensation. *See Plaintiff's Complaint*. Mr. Baker also argues that he was wrongfully terminated. *See Plaintiff's Complaint*, at ¶ 43. This particular allegation is improper given the nature of Mr. Baker's lawsuit and should not serve as a distraction from the single, FLSA issue in this case. In reality, Mr. Baker was terminated because he physically assaulted one of his ALSTOM colleagues.

4.    On September 14, 2005, the Court issued a *Scheduling Order*, that required the parties to file dispositive motions no later than December 12, 2005.  A trial date has not been set in this matter.

5.    Pursuant to statute, Mr. Baker's demand for unpaid compensation is limited to the time he worked for ALSTOM in the two years following April 19, 2003.[3]

## III.    STATEMENT OF RELEVANT AND UNDISPUTED FACTS

The following statement of relevant and undisputed facts is derived from Plaintiff's *Complaint*, his discovery responses and deposition testimony,[4] the deposition testimony of Defendants' representatives, and documents which were identified in those depositions and/or provided to Plaintiff during discovery.

1.    Tech Aid is a temporary placement agency.  On March 6, 2000, Tech Aid hired Mr. Baker.  *See Baker Deposition Transcript* ("*Baker Dep. Tr.*"), at 95, attached hereto as **Exhibit A**.  Tech Aid subsequently assigned Mr. Baker to work at ALSTOM's Philadelphia, Pennsylvania job site.  Mr. Baker understood his position with Tech Aid to be a temporary position lasting six (6) months and thereafter he would have an opportunity to work for ALSTOM full time.  *See Baker Dep. Tr.,* at 117 - 118, **Exhibit A**.

2.    ALSTOM is a recognized leader in the rail car and signaling industry. Among other things, ALSTOM provides maintenance and rehabilitation services for high speed rail operations, such as AMTRAK.  During Mr. Baker's temporary stint with Tech

---

[3] In certain circumstances not applicable here, the limitations period may be extended.  *See infra*, at fn 21.

[4] ALSTOM accepts the facts alleged by Plaintiff as true only for purposes of this *Motion*.

Aid, he spoke with ALSTOM's managers about the possibility that he would be hired by ALSTOM.

3.     ALSTOM's standard requirements for the Electrical Engineer position were "a minimum of 5 years experience in the rail industry" and "five years experience within a design-engineering department as an Electrical Engineer or equivalent."  *See ALSTOM Job Posting*,[5] attached hereto as **Exhibit B**; *see also Gregory Muscato* ("*Muscato*") *Dep. Tr.*, at 50, 51, attached hereto as **Exhibit C**.  Applicants were further instructed that the Electrical Engineer position required a "bachelor's or higher degree in Electrical, Electronic, or other appropriate engineering field."  *Id.*

4.     Mr. Baker completed an *Employment Application* for the position of Electrical Engineer with ALSTOM.  *See Baker Employment Application*, attached hereto as **Exhibit D**.  Therein, Mr. Baker represented, *under oath*, that he possessed a bachelor's degree in Electrical Engineering from SUNY Binghamton.[6] *Id.*

5.     In October 2000, ALSTOM offered Mr. Baker a full-time position with the company as an overtime exempt Electrical Engineer in its Washington, D.C. job site. *See ALSTOM Letter*, dated October 16, 2000, attached hereto as **Exhibit E**.  ALSTOM expressly informed Mr. Baker that the position of Electrical Engineer "would be exempt from overtime" and that he would be paid $55,000.00 per year on a salary basis.  *Id.*  ALSTOM's letter instructed Mr. Baker to acknowledge his acceptance of its terms by

---

[5] Mr. Baker conceded that he had seen this document before (*Baker Dep. Tr.*, at 148, **Exhibit A**), and that it was similar to the one that he viewed on ALSTOM's web site when he was applying for the ALSTOM Electrical Engineer position (*Baker Dep. Tr.*, at 146 – 148, **Exhibit A**).

[6] *See Baker Dep. Tr.*, at 127, **Exhibit A**.  Founded in 1946, SUNY Binghamton is recognized as one of the leading public universities in the United States, ranking 74th (1st tier) in the 2005 - 2006 U.S. News & World Report's feature on America's Best Colleges.

signing a copy of the letter and returning it to ALSTOM. *Id*. Mr. Baker signed the letter on October 27, 2000, and returned it to ALSTOM. *See* **Exhibit E**.

6.     Prior to accepting a position with ALSTOM as an overtime exempt Electrical Engineer, Mr. Baker possessed extensive experience in the field of engineering and electronics. By his own admission, after separating from the Navy (and subsequently with the Naval Reserves), as an Aviation Electronics Technician in 1987, Mr. Baker served in the following engineering and electronics positions:

- Electronic Service Technician for Heathkit Electronic Center (Virginia Beach, Virginia, September to December 1981);
- Electronics Technician Level II for Superior Engineering (Norfolk, Virginia, January 1982 to June 1982);
- Electronics Technician for the Naval Air Rework Facility in Norfolk, Virginia (June 1982 to June 1983);
- Electronics Technician for Volt Technical Services (June 1983 to September 1983);
- Research and Development Avionics Engineering Technician for General Dynamics, Convair, in San Diego, California (October 1983 to January 1984);
- Field Service Engineer for Grumman Aerospace in Norfolk, Virginia (December 1983 to March 1990);
- Electronics Technician for Contract Technical Resources in Newport News, Virginia (March 1990 to August 1990);
- Electronics Technician for Cherokee Electronics Corporation in Virginia Beach, Virginia (September 1990);
- Laboratory Specialist for GE Aerospace's Test Equipment Engineering Department in Binghamton, New York (September 1990 to March 1991);
- Production Test Technician for Wheatstone Corporation in Syracuse, New York (April 1991 to October 1991);
- Production Test Technician for McIntosh Labs in Binghamton, New York (August 1996 to September 1996); and
- Test Engineer for Lockheed-Martin Controls/Power & Drive Systems in Johnson City, New York (July 1997 to May 1999).

*See Plaintiff's Answer to Defendant's First Set of Interrogatories* (Interrogatory No. 18).

7.     With respect to his engineering and electronics background and his qualifications for the position of an overtime exempt Electrical Engineer with ALSTOM,

Mr. Baker had engaged in extensive specialized intellectual instruction and study. According to Mr. Baker, he attended the following academic institutions for the purpose of furthering his studies in engineering.[7]

- Tidewater Community College – Associates Degree in Electronic Engineering Technology (1982);
- Onondaga Community College – Associates Degree in Engineering Science (1994); and
- SUNY Binghamton, Thomas J. Watson School of Engineering and Applied Science.[8]

*See Plaintiff's Answer to Defendant's First Set of Interrogatories* (Interrogatory No. 17).

In addition to the above-referenced courses of instruction, Mr. Baker testified that he has attended City Colleges of Chicago (*Baker Dep. Tr.*, at 20, **Exhibit A**) and Old Dominion University (*Baker Dep. Tr.*, at 21, **Exhibit A**). Mr. Baker has also attended a number of electronics and technical courses while he served on active duty with the Navy, to include the following:

- Basic Electricity & Electronics (6 weeks);
- Avionics "A" School (21 weeks);
- Advanced First Term Avionics [ranked 3rd in class] (27 weeks);
- E2-C Electronic Systems Analyst (32 weeks);
- Airborne Early Warning Flight Technician (22 weeks);
- Avionics Communications Systems Technician (6 weeks); and
- NASA Solder Certification, Cable Repair (3 weeks).

---

[7] Mr. Baker has failed to produce his complete academic transcripts despite repeated requests for the same during the course of discovery.

[8] Mr. Baker represented in his *Employment Application* (**Exhibit D**), and at various other points during his ALSTOM employment that he possessed a B.S. in Electrical Engineering. However, upon filing this instant lawsuit, Mr. Baker omitted reference to his degree and now claims that he is actually several credits shy of completing his degree requirements with SUNY Binghamton. *See Baker Dep. Tr.*, at 127, **Exhibit A** (claiming that he has taken 110 out of the 122 required credit hours for completion of his bachelor's degree). Mr. Baker's duplicity does not affect the outcome of the analysis of this matter or ALSTOM's entitlement to summary judgment. While ALSTOM necessarily and effectively relies on Mr. Baker's testimony and statements under oath for this motion, Mr. Baker's resume fraud and pattern of deceit about his credentials speaks volumes about his character and credibility at trial.

8.      As an ALSTOM Electrical Engineer, Mr. Baker was required to use certain highly technical tools as a part of his job, such as an oscilloscope[9], digital volt meter,[10] HI-POT, chart recorder[11] and a capacitance meter.[12]

9.      Mr. Baker was responsible on a daily basis for troubleshooting and providing technical maintenance of ALSTOM's high-speed trains, specifically its AMTRAK operations.  *See Moses Dep. Tr.*, at 58, **Exhibit F**.  A substantial part of Mr. Baker's duties consisted of investigating technical faults and anomalies.  A "fault" consisted of a technical problem with a high-speed train that had a known solution and could be resolved by reference to a manual.  *See Moses Dep. Tr.*, at 76, **Exhibit F**. Conversely, an anomaly was considered a technical problem that had no known standardized repair procedure.  *See Moses Dep. Tr.*, at 76, **Exhibit F**.  Repairing an anomaly required a deeper level of experience, training and ingenuity.  *See Moses Dep. Tr.*, at 76, **Exhibit F**.  Repairs of anomalies would be assigned to ALSTOM's Electrical Engineers, such as Mr. Baker, as opposed to technicians.[13]  Electrical Engineers, such as Mr. Baker, exercised a greater degree of independent judgment than a regular technician. *See Moses Dep. Tr.*, at 184, 189 – 190, **Exhibit F**.  Repairing anomalies also required the

---

[9] An oscilloscope tracks electrical signals.  *See Curtis Moses's* ("*Moses*"), *Dep. Tr.*, at 35 - 36, attached hereto as **Exhibit F**.

[10] A digital volt meter measures the value of electrical current.  *See Moses Dep. Tr.*, at 36, **Exhibit F**.

[11] A chart recorder measures electrical signals for data collection.  *See Moses Dep. Tr.*, at 36, **Exhibit F**.

[12] A capacitance meter is an electronic device that measures how much capacitance is on a particular substance or potential electrical charge.  *See Moses Dep. Tr.*, at 36, **Exhibit F**.

[13] Mr. Baker conceded that it was "rare" for a technician in his field to occupy their position with only a high school education.  *See Baker Dep. Tr.*, at 229, **Exhibit A**.

use of a lap top computer which contained specialized software.[14]  *See Moses Dep. Tr.*, at 79 - 80, **Exhibit F**.

10.     Mr. Baker was responsible for supervising between one to four technicians who were assigned to the job site.  *See Moses Dep. Tr.*, at 82, **Exhibit F**.  Mr. Baker also provided input with respect to recommending promotions for the technicians whom he supervised.  *See Moses Dep. Tr.*, at 92, 94 – 95, **Exhibit F**.

11.     Mr. Baker worked independently on a daily basis.[15]  *See Moses Dep. Tr.*, at 97, **Exhibit F**.

12.     Mr. Baker expressed his desire to assume increased responsibility for supervising other employees.  *See Moses Dep. Tr.*, at 95, **Exhibit F**.  In response, Mr. Baker was advised that he would receive training and personal mentoring in order to assume those additional responsibilities.  *See Moses Dep. Tr.*, at 95, 96, **Exhibit F**.

13.     Mr. Baker's job performance was measured through periodic self evaluations and feedback from his direct manager, Curtis Moses.  *See Baker Performance Self Evaluations*, dated February 2002 and February 2003 respectively, attached hereto as **Exhibits G** and **H**; *see also Moses Dep. Tr.*, at 135, **Exhibit F**.  In his 2002-2003 *Performance Self Evaluation*, Mr. Baker identified his performance objectives:

- take initiative to independently resolve problems and propose methods to analyze causes;
- refine independent decision making skills in order to minimize supervisory intervention;

---

[14] ALSTOM conducted a recurring two week in-house training program on how to use the software.  *See Moses Dep. Tr.*, at 79, **Exhibit F**.  Mr. Baker disclosed that one of the intellectual challenges of his Electrical Engineer position was that the software was written in French.  *See Baker Dep. Tr.*, at 253 – 254, **Exhibit A**.

[15] Mr. Baker reported to Curtis Moses, who was ALSTOM's site supervisor.  *See Baker Dep. Tr.*, at 149, **Exhibit A**.  Notably, Mr. Baker is of the opinion that his experience and training was greater than Mr. Moses's.  *See Baker Dep. Tr.*, at 175, **Exhibit A**.  Mr. Baker's hubris further undercuts his claim that he was not an exempt professional employee.

- gain a better understanding of corporate organization and business operations and be more versatile by acquiring a broader knowledge of company products; and
- assist in product development and improvement.

*See* **Exhibit G,** at page ALS 0357.

Mr. Baker also described his qualifications as follows: "I'm a **degreed Electrical Engineer** with 20 plus years of technical experience, the last 5 years have been in the rail road industry, both in the lab [and] field." *See* **Exhibit G**, at page ALS 0358. (Emphasis added). Mr. Baker aspired to become a Project Leader. **See Exhibit G**, at page ALS 0359.

Mr. Baker's *Performance Self Evaluation* for the following year, reiterated his calendar year 2002 performance objectives and noted his additional objectives:

- [resolving technical problems] by proposing methods to avoid the same or similar situations;
- become a better team player but with minimal supervision;
- become technical more diverse by developing a broader knowledge of more company products;
- be an instrument of project success [and] hone the skills required to break new ground on future projects; and
- develop leadership attributes with customer focus.

*See* **Exhibit H**, at page ALS 0365.

In his 2003 *Performance Self Evaluation*, Mr. Baker noted his strengths and technical proficiencies as follows:

In the year since my last evaluation I feel as though I've developed greater understanding of this project from a technical standpoint and have been afforded the opportunity to broaden my knowledge base by cross training on another product. My **Electrical Engineering Degree** and strengths in Power Electronics, Electrical Machines and Analog/Digital Controls make me a good fit for this business and also allows for opening new opportunities within the company.

Now that I've been cross trained on another program [AEM-TAC], in addition to NEX-FPA/Amtrak Acela [and] HHP, I expect to achieve the same level of competency on that program as well. [In] addition, software and hardware failure

analysis technical abilities should be . . . such that I can take the Lead on this site. **With my recent designation as Lead Engineer**, I need to focus on leading ALSTOM techs and training customer techs.

*See* **Exhibit H**, at page ALS 0367. (Emphasis added).

14.     In mid-2003, as referenced in his *Performance Self Evaluation*, Mr. Baker was designated as ALSTOM's Project Lead.  *See Moses Dep. Tr.*, at 160, **Exhibit F**. Thereafter, Mr. Baker was tasked with the oversight of six (6) locomotives, that were assigned to the Maryland Department of Transportation.  In this role, Mr. Baker was responsible for managing the "day-to-day activities, troubleshooting, interfacing with the customer, engineering investigation, technical analysis and reporting back to [ALSTOM's operating location in France] on a weekly basis."  *See Moses Dep. Tr.*, at 161, **Exhibit F**.  As the Project Lead, Mr. Baker also personally supervised the efforts of various technicians assigned to the Maryland Department of Transportation.[16]  *See Moses Dep. Tr.*, at 162, **Exhibit F**.

15.     In 2003, ALSTOM's Human Resources Department conducted a *Job Audit* for the purpose of properly classifying each of the employees in its commissioning and warranty department in the United States.[17]  *See Moses Dep. Tr.*, at 168, **Exhibit F**. The audit was intended to provide uniform job responsibilities, consistent job classifications and to create a distinct job level within each position description.  *See Moses Dep. Tr.*, at 168, 169, **Exhibit F**; *see also Muscato Dep. Tr.*, at 22 - 23, **Exhibit C**.

---

[16] Mr. Baker admitted that new employees were instructed to "follow him around" to benefit from his experience and training.  *See Baker Dep. Tr.*, at 204, **Exhibit A**.

[17] The commissioning and warrant group was responsible for repairing "anomalies in any servicing of the contract or the delivery of the trains for a certain period of time after [ALSTOM] produce[d] the trains, either refurbish them or build them new.  And Mr. Baker was part of that team."  *See Muscato Dep. Tr.*, at 26, **Exhibit C**.

The *Job Audit* was performed primarily by human resources manager, Luis Gomes.[18]  *See Moses Dep. Tr.*, at 169, **Exhibit F**.  Mr. Gomes personally contacted ALSTOM employees in order to obtain each employee's self-identification of his or her duties and responsibilities.  Mr. Gomes interviewed Mr. Baker and obtained Mr. Baker's self-assessment of his Electrical Engineer position.  *See Baker Job Audit*, dated December 18, 2003, attached hereto as **Exhibit I**.  In Mr. Baker's *Job Audit*, he represented the following facts to Mr. Gomes:

- His position title was Electrical Engineer;
- he was self directed;
- the purpose of his position was to provide product support, timely and reliable maintenance and provide technical assistance to the customer;
- he possessed 20 years of experience and possessed a Bachelor of Science degree in Engineering and an Associates Degree as well;
- his daily duties consisted of, among other things, coordinating with customers, tracking failures and evaluating vendors services, and performing maintenance on ALSTOM's locomotives;
- he used various technical tools to accomplish his job, including a lap top computer,
- he was primarily self directed with respect to his daily activities;
- he made his own decisions on how to prioritize his work activities;
- he had daily interactions with ALSTOM's customers and other subordinate technicians and/or engineers;
- he used a computer to create procedure, and draft emails and technical reports.

*See* **Exhibit I**.  The purpose of the *Job Audit* was to ensure that ALSTOM remained compliant with the Fair Labor Standards Act.  *See Muscato Dep. Tr.*, at 27, **Exhibit C**.

---

[18] Mr. Baker acknowledged that he telephonically spoke with Mr. Gomes and provided him with the information that was ultimately written on the *Job Audit* form.  *See Baker Dep. Tr.*, at 190 – 191, **Exhibit A**.

16.     In May 2003, around the same time Mr. Baker was assigned duties as ALSTOM's Project Lead, his salary was increased to $59,854.00.[19]  *See ALSTOM Merit Increase Letter*, dated May 1, 2003, attached hereto as **Exhibit J**.  While Mr. Baker was not eligible for overtime compensation, he was entitled to, and did receive "comp time."  *See Moses Dep. Tr.*, at 154, 166, **Exhibit F**.

17.     During the relevant period of time, Mr. Baker was designated as a "key employee."  *See Moses Dep. Tr.*, at 183, 184, **Exhibit F**.  A key employee was considered someone who was assigned more difficult tasks.  *See Moses Dep. Tr.*, at 183, 184, **Exhibit F**.

18.     In 2004, ALSTOM instituted a new compensation program, wherein Mr. Baker's Electrical Engineer position was re-titled as a Test Engineer Specialist.[20]  *See Test Engineer Specialist Post Description*, attached hereto as **Exhibit K**; *see also Muscato Dep. Tr.*, at 49, **Exhibit C**.  A Test Engineer Specialist was required to perform the following tasks:

> evaluation of systems, subsystems and components in various settings and sites. Liaise with Engineering from various internal and external units, vendors and customers.  The TES will act as a customer interface on test issues at service sites. Also could supervise site staff performing proof of design testing, warranty and commissioning testing.

*See* **Exhibit K**.

The responsibilities of the position included the following duties:

> • Ensure that tests are conducted in a safe [manner] including ensuring the safety of people and equipment in, near or around the test area and unit under test;

---

[19] Mr. Baker also contends that he received a salary increase in calendar year 2002.  *See Plaintiff's Complaint*, at ¶ 25.

[20] A Test Engineering Specialist was equivalent to an Electrical Engineer.  *See Muscato Dep. Tr.*, at 49, **Exhibit C**.

- Must be capable of self-managing assigned projects including all aspect of the project (technical, managerial, administration, etc.);
- Define and develop the test environment and anticipate personnel, time, equipment and instrumentation needs;
- Develop schedules, plans, work assignments, track/equipment requests, test status logs, local operating procedures, etc as required for all onsite testing;
- Ensure proper and calibrated equipment is available for all tests and maintain a database of site instrumentation with calibration status;
- Assist in providing technical expertise and support/training/technical guidance as required to customer and service site staff;
- Produce or assist in producing as required detailed customer and internal test reports for testing performed;
- Work closely on a technical level with the customers, vendors, service management and Project Office, providing feedback on equipment status and work performed as sites required/requested; and
- Analyze data, and trends to determine if equipment meet performance criteria.

*See* **Exhibit K**.

## IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

If there is "no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is "not a disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(quoting Rule 1 of the Federal Rules of Civil Procedure).

A movant seeking summary judgment has the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, which it believes demonstrate the absence of any genuine issues of material fact. Once that burden has been met, the non-moving party must

respond by presenting cognizable evidence sufficient to establish genuine issues of dispute as to the *material* facts in the case. The non-movant's failure to present "affirmative evidence" in this regard is fatal to its position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257-58 (1986). Speculation, conclusory allegations, and the non-movant's denials are insufficient to raise genuine issues of material fact. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Application of Rule 56(c) does not demand that there be no disputes of fact of any kind. As the Supreme Court noted in *Anderson, supra*, "the mere existence of *some* alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." 477 U.S., at 247-48 (emphasis in original). The pertinent question therefore, is whether the non-moving party's evidence "presents a sufficient disagreement to require a submission to the jury, or whether it is so one-sided that [the moving party] must prevail as a matter of law" on an essential element of the case. *Anderson, supra*, 477 U.S., at 251.

In reviewing a motion for summary judgment, the Court is required to view any permissible inferences to be drawn from the underlying facts in a light most favorable to the non-moving party. However, if after viewing the evidence in a light most favorable to the non-moving party, the Court finds that the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to its case, upon which it will bear the burden of proof at trial, the Court should render summary judgment against the party. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990). As

Judge Winter instructed in *Bland v. Norfolk & Southern Railroad Co.*, 406 F.2d 863, 866

(4th Cir. 1996):

> The function of a motion for summary judgment is to "smoke out" evidence to see
> if there is any case, i.e. any genuine dispute as to any material fact, and it there is
> no case, to conserve judicial time and energy by avoiding an unnecessary trial and
> by providing speedy and efficient summary disposition.

(quoted in *McNeiry v. McGraw Hill*, 919 F. Supp. 853 (D.Md. 1995)); *see also Fidelity v.*

*Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

## V.    **ANALYSIS**

### A.    Whether Plaintiff Was Properly Classified As Overtime Exempt Is An Issue Of Law For The Court To Decide.

The FLSA exempts employees who work in a "bona fide executive,

administrative, or professional capacity."  29 U.S.C. §213(a)(1).  Although these terms

are not defined in the FLSA, the Secretary of Labor has promulgated regulations defining

these terms.  *See* C.F.R. §541 *et. seq*.  In FLSA cases, the issue of whether the duties of

an employee's work qualify him or her as an "executive," "administrative" or

"professional" employee is a question of law to be resolved by the Court.  *See Icicle*

*Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  In this case, as a matter of law,

Mr. Baker was properly classified as an exempt employee and, therefore, not entitled to

overtime compensation.

### B.    The Relevant Period Of Time At Issue In This Matter Is Limited To April 18, 2003 to June 28, 2004.

Any action for unpaid overtime compensation under the FLSA must be

commenced within two years after the cause of action accrues.  29 U.S.C. §255(a).

Because a separate cause of action accrues on the payday following the date upon which

each incident of overtime was worked, employees may pursue causes of action for only

those overtime incidents falling in pay periods that had paydays within the two-year period. *See Archer v. Sullivan County, Tennessee*, 129 F.3d 1263 (6th Cir. 1997); *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir.), *cert. denied*, 513 U.S. 929, 115 S.Ct. 318 (1994); *McIntyre v. Division of Youth Rehabilitation Services for Children*, 795 F.Supp. 668 (D.Del. 1992); *Erikson v. New York Law School*, 585 F.Supp. 209 (S.D.N.Y. 1984). Employees may not reach back in time to challenge violations that occurred in pay periods outside the normal limitations period. *See Acosta v. Yale Club of New York City*, 1995 WL 600873 (S.D.N.Y. Oct. 12, 1995).

Mr. Baker filed his instant lawsuit on April 18, 2005. Therefore, Mr. Baker is limited to pursuing his claim for unpaid overtime for a period of two years; in this case from April 18, 2003 to when he was terminated for misconduct on June 28, 2004.[21] The undisputed facts demonstrate that during this period of time, Mr. Baker was occupied in a position that was exempt from overtime compensation.

C.    Plaintiff Was Properly Classified As Exempt Under The Professional Exemption Because He Was Paid On A Salary Basis.

---

[21] Any argument by Mr. Baker that ALSTOM willfully violated the FLSA would be disingenuous given ALSTOM's demonstrated good faith through its *Job Audit*, reliance of Mr. Baker's representations and formation of a new compensation package. Willfulness requires more than mere negligence - - violations are not willful unless "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the FLSA. *McLaughline v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir. 1988)(failure to pay employees overtime on basis of good faith belief that they qualified for executive or administrative exemption of FLSA not willful); *Boekemeier v. Fourth Universalist Society in the City of New York*, 86 F.2d 280 (S.D.N.Y. 2000)(citation omitted)("willfulness cannot be found on the basis of mere negligence or on a completely good faith but incorrect assumption that a pay plan complied with the FLSA in all respect."); *Troutt v. Stavola Bros., Inc.*, 905 F.Supp. 295 (M.D.N.C. 1995)(no willfulness even though employer failed to investigate its responsibilities under FLSA); *Masters v. City of Huntington*, 800 F.Supp. 355 (S.D.W.V. 1992).

The first formula under the "old short test,"[22] to determine whether an employee qualified as exempt under the professional exemption was the *salary basis test*. Under this standard, an employee had to be paid a salary of no less than $250.00 on a weekly basis. C.F.R. § 541.118(a) provides the following instruction:

> An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

*Id.*

At all relevant times, Mr. Baker's salary exceeded $250.00 per week. ALSTOM hired Mr. Baker in September 2000 and advised him, by letter, that his starting salary would be $55,000.00. *See* **Exhibit E**. Mr. Baker approved of his starting salary and acknowledged that his position with ALSTOM was as an overtime exempt Electrical Engineer by affixing his signature to the letter and returning a copy of it to ALSTOM. *Id.* Moreover, Mr. Baker received salary increases while employed by ALSTOM during calendar years 2002 and 2003. *See supra, Statement of Relevant and Undisputed Facts*, at ¶ 16; *see also Plaintiff's Complaint*, at ¶ 25. At no time did Mr. Baker's weekly salary fall below the amounts designated under the old FLSA standard of $250.00 per week. Furthermore, Mr. Baker does not contend that improper deductions were made with respect to his salary. Accordingly, it is undisputed that this Mr. Baker was paid on a salary basis as defined by the FLSA, thus, satisfying the first test of a professional employee.

---

[22] Because the relevant period of time in this matter pre-dated the Department of Labor's August 2004 revision of the FLSA, the "old short test" is applicable.

D.    Plaintiff Was Properly Classified As Exempt Under The Professional Exemption Because His Duties Were Consistent To Those Required Of A Professional Employee.

The second aspect of the "old short test" to determine whether an employee qualifies as exempt under the professional exemption is the *duties test*. Under this test, it must be demonstrated that the employee performed work that required knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study. The employee must also primarily perform work which requires the consistent exercise of discretion and judgment. *See* 29 C.F.R. §541.3(a)(1). Mr. Baker unquestionably occupied a position that fit within this criteria.[23]

> 1.    *Mr. Baker's position required knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.*

Mr. Baker's job as an ALSTOM Electrical Engineer is the position at issue in this matter. Plainly, the position needed to be occupied by someone who could perform work that required advanced knowledge. By its nature, the work necessary to maintain and repair high-speed trains (AMTRAK in particular), is highly specialized with absolutely no margin for error, given the well recognized safety considerations.[24]

ALSTOM's *Job Posting* specified certain professional traits that applicants for the Electrical Engineer were required to possess. Among these traits, applicants were advised that a standard requirement for the position was a "minimum of 5 years

---

[23] 29 C.F.R. §541.301(e)(1) instructs that, "[g]enerally speaking the professions which meet the requirement for a prolonged course of specialized intellectual instruction and study include law, medicine, nursing, accounting, actuarial computation, **engineering**, architecture, teaching, various types of physical, chemical, and biological sciences, including pharmacy and registered or certified medical technology and so forth." *Id.* (emphasis added).

[24] Mr. Baker presently works for AMTRAK. Undoubtedly, Mr. Baker was able to parlay his skills, training and experience with ALSTOM to secure his current AMTRAK position.

experience in the rail industry." *See supra, Statement of Relevant and Undisputed Facts*, at ¶ 3; *see also* **Exhibit B**. Applicants, like Mr. Baker, were also informed that the position required a "bachelor's or higher degree in Electrical, Electronic, or other appropriate engineering field." *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶ 3; *see also* **Exhibit B**.

Mr. Baker's professed experience and training easily surpassed these standards. By his own admission, at the time that he applied for the ALSTOM Electrical Engineer position, Mr. Baker possessed over "twenty years of technical experience," with at least five (5) years in the "rail road industry, both in the lab [and] field." *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶¶ 6, 13; *see also* **Exhibit G**. Mr. Baker also represented that he held a bachelor of science degree in Electrical Engineering. *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶¶ 4, 7; *see also* **Exhibit D**. In addition to his purported B.S. degree in Electrical Engineering, Mr. Baker possessed separate Associates Degrees from Tidewater Community College in Electronic Engineering Technology and from Onondaga Community College in Electrical Science. *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶ 7. Mr. Baker also testified that he participated in training opportunities while serving in the Navy and attended college courses at City Colleges of Chicago and Old Dominion University.[25] *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶ 7.

The actual duties and responsibilities of Mr. Baker's position also confirm his status as a professional employee. During the relevant period of time, Mr. Baker's daily tasks as an Electrical Engineer (and later re-titled as a Test Engineering Specialist),

---

[25] Mr. Baker also benefited from the many internal training opportunities offered by ALSTOM. *See supra, Statement of Relevant and Undisputed Facts*, at ¶ 13; *see also* **Exhibit H**.

included performing diagnostic servicing of AMTRAK trains, resolving complex technical problems, repairing anomalies with no known standardized repair procedures, analyzing software and hardware failures, conducting engineering investigations, site tests and systems evaluations, producing internal reports and tracking rail failures. Mr. Baker's skills were such that he was elevated to a position wherein he was tasked with additional responsibilities that required even greater knowledge of an advanced type. *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶¶ 13, 15, 18.

Mr. Baker's own testimony disclosed how intellectually challenging his position was as an Electrical Engineer. Specifically, Mr. Baker acknowledged the following demands for the position:

> I would say the highly integrated nature of the different systems, that - - how they all interacted to each other, the electronic systems all - - there were so many - - quite a few different systems, a lot which weren't really even in the scope of ALSTOM's responsibility. But they all interacted and operated together.

> There were three major components to the consortium that built the train. And ALSTOM was only one of them. And other manufacturers provided their equipment. And - - however they all had to work together. So that would probably be maybe the second most challenging portion of understanding how the train worked. Being able to read the diagrams.

*See Baker Dep. Tr*., at 255, **Exhibit A**.

Given these undisputed facts, any attempt by Mr. Baker to characterize his position as anything but one that required knowledge of an advanced type in a field of science must be disregarded.[26] The circumstances at play in this matter are analogous to those addressed in *Leslie v. Ingalls Shipbuilding, Inc*., 899 F.Supp. 1578 (S.D.Miss. 1995). In *Leslie*, the court analyzed a complaint for overtime compensation (similar to

---

[26] ALSTOM anticipates that Mr. Baker will attempt to portray himself as a mere manual laborer. Such a claim would be highly disingenuous in light of the undisputed facts in this matter.

Mr. Baker's), filed by an engineer.  In granting summary judgment in favor of the employer, the court took note of the employee's years of experience, academic studies and assumption of significant responsibilities.  *Id*.  After reviewing these factors, the court concluded that the plaintiff, who had three years of university study[27] and 30 years of experience in engineering, performed work that was predominantly intellectual in nature.  Accordingly, the court did not hesitate to consider the plaintiff as an exempt professional employee.  *See also Aneja v. Triborough Bridge and Tunnel*, 35 Fed.Appx. 19, 8 Wage & Hour Cas.2d (BNA) 1408, (2nd Cir. 2002)(finding that an employee who earned a salary of $68,000.00 per year, who worked in engineering, and who exercised discretion and judgment regularly was a "professional employee" who was exempt from the FLSA overtime provisions).  *Id*.

> 2. *Mr. Baker is exempt under the FLSA because he consistently exercised discretion and independent judgment in his position as an Electrical Engineer.*

A "professional employee" is also considered an individual who performs tasks that require the consistent exercise of discretion and judgment.  *See* 29 C.F.R. §541.3(e).  Mr. Baker's admissions that he met this criteria further support the entry of summary judgment in favor of ALSTOM.  Specifically, in his own *Performance Self Evaluations*, Mr. Baker acknowledged that his objectives included taking "initiative to independently resolve problems and propose methods to analyze causes," and "refine independent decision making skills in order to minimize supervisory intervention."  *See supra*, *Statement of Relevant and Undisputed Facts*, at ¶ 13; *see also* **Exhibit G**.  Mr. Baker also sought and was re-designated to the position of ALSTOM's Project Lead wherein he was independent decision making responsibilities were enhanced even further.  *See supra*,

---

[27] The plaintiff in *Leslie* did not complete all of the necessary college courses to obtain a degree.

*Statement of Relevant and Undisputed Facts*, at ¶¶ 12,  13, and 14; *see also* **Exhibits G**

and **H**.   Moreover, Mr. Baker conceded during ALSTOM's *Job Audit* that he was

primarily self directed with respect to his daily activities.   *See supra*, *Statement of*

*Relevant and Undisputed Facts,* at ¶ 15; *see also* **Exhibit I**.

     In sum, Mr. Baker's duties and responsibilities met the requirements for

exemption as a professional employee under the salary basis and duties test.

Accordingly, Mr. Baker is not entitled to overtime pay, and summary judgment in favor

of ALSTOM is warranted.

     WHEREFORE, Defendant, ALSTOM Transportation Inc., respectfully requests

that the Court issue an *Order* granting its *Motion to Summary Judgment.*

               Respectfully Submitted,


               _____/s/_____
               Pamela J. White (D.C. Bar No. 962787)
               Neil E. Duke (D.C. Bar No. 471942)
               Ober, Kaler, Grimes & Shriver
               A Professional Corporation
               120 East Baltimore Street
               Baltimore, MD  21202-1643
               (410) 685-1120
               (410) 547-0699 – Fax
               Attorneys for Defendant, ALSTOM
               Transportation Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEVIN PATRICK BAKER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil File No.: 05-CV-1352(RCL) |
| | ) |
| ALSTOM TRANSPORTATION INC. | ) |
| | ) |
| Defendant. | ) |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on this 12th day of December 2005, that a copy of the foregoing *Defendant's Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgment* was served electronically upon Plaintiff's counsel identified below:

> Alan Banov, Esquire
> Norberto Salinas, Esquire
> Alan Banov & Associates
> 1819 L Street, N.W., Suite 700
> Washington, D.C. 20036

_____
            */s/*
Pamela J. White (D.C. Bar No. 962787)

Neil E. Duke (D.C. Bar No. 471942)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, MD 21202-1643
(410) 685-1120
(410) 547-0699 – Fax

Attorneys for Defendant, ALSTOM
Transportation Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KEVIN PATRICK BAKER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil File No.: 05-CV-1352(RCL) |
| | ) | |
| ALSTOM TRANSPORTATION INC. | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Upon consideration of Defendant's *Motion for Summary Judgment*, Plaintiff's *Opposition*

thereto, Defendant's *Reply* and all argument, it is hereby ORDERED, that, Defendant's

*Motion for Summary Judgment* is GRANTED, and that Plaintiff's *Complaint* is dismissed

with prejudice.


_____          _____
Date                                          Judge, United States District Court

777702.2                                              25