# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - X

KEVIN PATRICK BAKER, :
Plaintiff, :
Vs. : Case No.: 05-CV-1352
ALSTOM TRANSPORTATION, :
INC., :
Defendant. :

- - - - - - - - - - - - X

Monday, November 7, 2005

Washington, D.C.

Deposition of:

CURTIS MOSES,

the Witness, called for examination by counsel for the Plaintiff, pursuant to notice, commencing at 9:45 a.m., at the law offices of Alan Banov & Associates, 1819 L Street, N.W., Washington, D.C., before Curtis R. Cloward, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

NOV 23 2005

MR. DUKE: If you can respond.

THE WITNESS: Yes, it would be not a requirement.

MR. BANOV: To have a bachelor's degree.

BY MR. BANOV:

**Q. Do you know what tools he needed for that job in Philadelphia?**

A. Yes. There would be an oscilloscope.

**Q. Say that again.**

A. Oscilloscope, digital volt meter, HI-POT, H-I hyphen P-O-T, chart recorder, capacitance meter.

**Q. Capacitance?**

A. Capacitance meter. C-A-P-A-C-I-T-A-N-C-E, meter.

**Q. Okay.**

A. That would be -- digital volt meter.

**Q. You mentioned that.**

A. Did I mention that?

That would be the basics.

**Q. What does an oscilloscope do?**

A. An oscilloscope tracks electrical signals to create a wave form.

**Q. And what does a digital volt meter do?**

A. Digital volt meter measures the value of electrical current.

**Q. What is a HI-POT?**

A. HI-POT, it injects a high level of voltage to determine if you have two wires touching.

**Q. Was it chart recorder?**

A. Chart recorder. It measures electrical signals for data collection.

**Q. And what is a capacitance meter?**

A. It's an electronic device that measures how much capacitance is on a particular substance or potential electrical charge.

**Q. Do you know how to operate all of those pieces of equipment you just identified?**

A. Yes.

**Q. Okay, and how did you learn to operate the oscilloscope?**

A. During college courses, basic college

the table of contents for all these manuals.

I understand it's a pdf file. If you could E-mail me the pdf file consisting of the table of contents that would be satisfactory.

MR. DUKE: Thank you, counsel.

BY MR. BANOV:

**Q. Okay, Mr. Moses, explain exactly what you do in supervising Kevin.**

A. Okay, on a day-to-day basis Kevin would be given a job assignment on any one of the particular locomotive equipment located in Washington, D.C. to troubleshoot or do possibly sometimes to ride the train, meaning just as technical support.

The technical requests came from another gentleman, also on-site, a gentleman named Pascal Giroud, was an ex-pat. He was a site technical manager.

He would have a certain request, a technical request that would need to be carried out on a day-to-day basis.

**Q. Who gave Kevin the job of riding on**

A. No.

**Q. That could be a locomotive he had never dealt with before?**

A. Yes.

**Q. Or --**

A. Or --

**Q. -- a train set?**

A. -- or an anomaly that he's never dealt with before.

**Q. You're using the term "anomaly" and "fault." Can you please define those two terms for us?**

A. Okay, a fault would be something that you would probably identify in a manual that has already a known solution, i.e., if you had fault 003, it identified possibly there was a battery, low-battery-voltage fault, which is already a known fault. Basically there's a repair procedure for it.

If the locomotive locked up for whatever reason, with no fault indication, that would be considered an anomaly.

A. Yes.

**Q. And they have given this cook book for people in the States to use?**

A. Yes.

**Q. And if it's an anomaly, give me an idea about how an electrician, electrical engineer here would try to fix that anomaly.**

A. The anomaly would now require someone with a little bit more, or a little bit more stronger electrical or electronic expertise to troubleshoot the equipment.

It may require instrumentation of the vehicle, diagnostic software, the use of also a laptop as well. That was the interface.

**Q. Would technicians do that work in diagnosing an anomaly?**

A. Rarely.

**Q. Would they usually be done by the electrical engineer?**

A. Yes.

**Q. And whoever does it would have a laptop that they would hook up to the --**

A. Locomotive.
Q. -- to the locomotive?
And their computer's on the locomotive?
A. Yes.
Q. Okay, and that's the interface there.
A. Yes.
Q. And there's software on the laptop?
A. Yes.
Q. Does ALSTOM have courses for its employees on how to use that software?
A. Yes.
Q. You've had those courses?
A. Yes.
Q. Around how long would a typical course take?
A. About two weeks.
Q. That would be full-time? Would you be in the course full-time?
A. Yes, um-hum.
Q. And where were those courses given?
A. Directly on the service site:

Philadelphia, Washington, New York, Boston.

**Q. And who gives those courses?**

A. Gaby Amar.

**Q. Does he give those courses one-on-one or to a group of employees?**

A. A group.

**Q. Would I be correct -- well, so, would it be that a new software would come in and Gaby would assemble the group together and, say, explain over a period of time how they go about using that software?**

A. No.

**Q. Explain it to me.**

A. He would use the basic format of the software and instruct or teach a group of technicians or electrical engineers that are new to the project how this particular software works.

**Q. He would tell new employees --**

A. Yes.

**Q. -- about that. Okay.**

**And what is the range of time it could**

**Q. Maybe I should define "contact."**

**I mean, what I mean by "contact," I mean not just physical, close contact, but also by way of telephone or some other communication.**

A. Hourly or percentage?

**Q. Either way.**

A. Hourly, I would say maybe about an hour a day total.

**Q. Okay.**

**Kevin didn't supervise anybody, did he?**

A. Yes.

**Q. Who did he supervise?**

A. Night shift personnel.

**Q. And what category of employees were these?**

A. Technicians.

**Q. And how many technicians did he supervise?**

A. From one to four.

**Q. Did he always supervise technicians during the time that he worked for you?**

**Q. Okay, did Kevin have the authority to do evaluations for any of the technicians that he supervised?**

A. No.

**Q. Did Kevin have the authority to recommend promotions for any of the technicians who worked for him?**

A. Minimum input.

**Q. Explain.**

A. Since he would assign certain tasks to new employees, or new contractors, technicians, I would be -- I would have conversations that Kevin -- with Kevin at different times of how well the task was performed.

Kevin would be required at different times, depending on the task, to assess the repair, to ensure that the repair was made correctly, timely manner and safely.

So, based upon all those assessments, I would make my determination of the technical aspect of an employee.

**Q. So he gave you feedback on how well**

to fire any technicians who worked for the company?

A. No.

Q. Did he have the authority to recommend the firing of any technicians who worked for ALSTOM?

A. Yes.

Q. Did he ever exercise that authority?

A. No, not to my recall.

Q. Did you ever sit down with Kevin and talk with him about his authority to supervise technicians?

A. Yes.

Q. And do you recall when that was?

A. During performance evaluation.

Q. During which performance evaluation?

A. 2002 to 2003, and maybe 2003 to 2004 evaluations.

Q. And what do you recall -- well, let's take the earlier time.

A. Um-hum.

Q. What do you recall telling Kevin about

**his authority with respect to technicians?**

A. Goals during -- in the performance evaluation there's a section for goals and objectives. During that time there's an open conversation of -- of potential goals or that you would like to foresee yourself excelling within ALSTOM.

There's a short term, a midterm and a long term objective inside that evaluation where you would indicate some of your, you know, accomplishments that you would like to do during that time.

The discussion was discussed of moving on to being promoted to certain levels within ALSTOM.

**Q. In that conversation Kevin said that he would like to be able to supervise people?**

A. Yes.

**Q. Do you recall what he said in that regard?**

A. Possibly being promoted to site manager.

**Q. Did he ever say I would like to be in a position where I could supervise people?**

A. Yes.

**Q. When did he say that?**

A. During one of the evaluations; I don't recall which one it was.

**Q. And do you recall what you said in response?**

A. That it would be possible, with training.

**Q. Okay, did you give him a timetable for when he might be able to supervise people?**

A. No.

**Q. And what training did you have in mind?**

A. Excuse me?

**Q. What training did you have in mind?**

A. Training?

**Q. You say it would be possible with training.**

A. A mentorship type.

**Q. On-the-job training?**

A. Yes, um-hum.

**Q. Did you offer to mentor Kevin so he could be a supervisor?**

A. Repeat the question.

**Q. Okay, did you offer to mentor Kevin so he could become a supervisor?**

A. Yes.

**Q. And do you recall when you made that offer?**

A. 2004.

**Q. Do you recall when that was, what month approximately?**

A. Probably the beginning of 2004, probably January, somewhere around there.

**Q. Isn't it true that Kevin mostly worked alone?**

A. Yes.

**Q. Do you recall any situations where any technicians worked with Kevin when he was working for ALSTOM?**

A. Yes.

**Q. And do you recall how often that**

in HR in Hornell composes this?

A. Yes, um-hum.

Q. And it's supposed to be taken from the time records such as those we've just gone through, Exhibits 6, 7, 8 and 9?

A. Yes.

Q. Okay, is -- and then do you recognize Exhibit No. 11, Mr. Moses?

A. No.

Q. Okay.

You haven't seen a document like that before with that kind of format?

A. No.

Q. You mentioned before that you gave Mr. Baker some evaluations.

Can you explain ALSTOM's evaluation process, please?

A. Approximately April is when evaluations are due for all employees that are direct-line to each supervisor or either manager.

They are required to supply to each one of their direct-line reports the reformatted

you know, as part of the evaluation. And compensation of comp time, he would be given first priority to receive comp time. And that, you know, other efforts are being made to reduce the amount of overtime that he had to perform.

**Q. Do you know whether ALSTOM ever gave Kevin comp time for the overtime work that he did?**

A. Yes.

**Q. Was that recorded someplace?**

A. On time sheets, but it would not clearly state that it's comp time.

**Q. Okay, well, if you can pull out Exhibit 7, for example, and look over that, please, and see is there any reference on there to comp time earned or either comp time -- strike that -- comp time used?**

A. ALS 0260. Pay period May 22nd, '02.

**Q. Okay, what does it show?**

A. Twenty-two hours overtime work this pay period. I can't read the total or what it says comp.

well.

**Q. Do you know whether Matt Rivera told Kevin that he would be paid for the overtime hours he worked if he submitted them regardless of the FLSA code?**

A. No.

**Q. Did Kevin ever indicate that if he could not document his overtime he wouldn't work overtime?**

A. No.

**Q. Did he ever say something, in effect, after eight hours I'll drop my tools and go home?**

A. No.

**Q. Isn't it true that he was in a position where he couldn't drop his tools and go home if there was still work to be performed on a locomotive?**

A. Yes, there were times.

**Q. Did Kevin ever become a project lead?**

A. Yes.

**Q. When?**

A. 2003.

**Q. Do you recall about when?**

A. Probably mid-year.

**Q. And do you recall how that occurred?**

A. Yes. Conversation with the operations manager, Gaby Amar, him and I decided that it would be best to give more responsibility to Kevin.

And we assigned him six locomotives for the Maryland Department of Transportation to manage day-to-day activities, troubleshooting, interfacing with the customer, engineering investigation, technical reports, technical analysis and reporting back to France on a weekly basis.

**Q. Is there some document that laid out his new responsibilities?**

A. No.

**Q. But I say "document," would that also include an E-mail? Would there be an E-mail or anything that would describe to him his new responsibilities?**

A. Not generated from me.

Q. Did somebody else generate?
A. Possibly Gaby Amar.
Q. Do you think you saw such a document?
A. No.
Q. Okay, you just described some responsibilities for the project lead.
Were those responsibilities actually given to Kevin?
A. Yes.
Q. Okay, and that was around mid-2003 you say?
A. Yes.
Q. And did you -- did he supervise anybody in that position -- strike that.
When he became the project lead did he supervise anybody?
A. Yes.
Q. Who did he supervise?
A. The customer.
Q. Supervised the customer?
A. Yes.
Q. The Maryland Department of

for doing that work?

A. Yes.

Q. Did you tell him that the company would give him overtime pay?

A. No.

Q. What did you tell him as far as extra compensation?

A. Time, comp time.

Q. Comp time.

Did you give him comp time for working the extra time?

A. Yes.

Q. Did he use the comp time?

A. Yes.

Q. Okay.

Now, back to the Maryland Department of Transportation technicians. Isn't it true that all Kevin really did was to train them?

A. If you can rephrase the question?

Q. Well, didn't Kevin train those technicians to maintain the equipment?

A. Yes.

**Q. Do you recall about when in 2003?**

A. No, I don't.

MR. DUKE: I will interpose an objection, a continuing objection just for the sake of the record.

We've identified another witness who is going to respond specifically on these points, as has been noted to counsel.

I'll permit you to ask the questions, and the Witness can certainly answer to the best of his knowledge. But just for the record's sake, another witness will be designated for these points.

MR. BANOV: Understood, thank you.

BY MR. BANOV:

**Q. What is your understanding about this audit?**

A. That there was going to be a classification of the commissioning and warranty department, U.S.-wide, so that everyone's responsibilities would be uniform, and job classifications, and to create a job level within

each job description by alphabetical order.

**Q. But the positions or the people in alphabetical order?**

A. The people. Well, people and positions.

**Q. Did you observe any audit in your offices in 2003?**

A. Yes.

**Q. Okay, explain what you observed.**

A. By phone conversation, ALSTOM's HR manager, Luis Gomez, contacted me and informed me that he was going to perform audits on various individuals at site.

**Q. Did he telephone your subordinates?**

A. Yes.

**Q. Was Kevin one of those?**

A. Yes.

**Q. Were you present at either end of the telephone when Mr. Gomez talked to Kevin in this audit?**

A. No.

**Q. Did Mr. Gomez talk with you about his**

**Q. Some of your testimony regarded an individual by the name of Saluka, whose last name I won't attempt.**

**Can you state for me the difference between Saluka versus Kevin Baker with respect to the level of independence that each would have exercised at the job?**

A. Each individual would be able to work on a assigned, defined task on their own. Saluka would be able to accomplish a task of a less degree of difficulty than Kevin Baker.

**Q. Are you familiar with the term "key employee"?**

A. Yes.

**Q. And was that term applicable to Mr. Baker?**

A. Yes.

**Q. And what does the term, "key employee," designate to you?**

A. Someone that is -- you consider to -- responsible, someone that follows through on assigned tasks, someone that you favor, to be

able to give a more difficult task to.

**Q. The general difference between the level of independence exercised by a technician versus an electrical engineer, in your estimation?**

A. Repeat the question.

**Q. The difference, the qualitative difference, in the amount of independent judgment exercised by a technician versus an electrical engineer?**

A. Technician would pretty much would have to use his judgment based upon a manual, a troubleshooting manual. And have to rely upon another more experienced personnel to give them guide-ship or some type of leadership doing troubleshooting.

Engineer, would have more independent thought -- thought -- and basically training to make snap judgments on releasing the train for revenue service.

**Q. And before you had testified about the difference between anomalies versus faults.**

Q. Was there anything else that you can recall?

A. No, that's pretty much it.

Q. Earlier, you testified regarding Exhibit No. 4, which is captioned as a job posting. I'll let you look through mine.

After having had an opportunity to review this document, were the, say, the captions of experience and skills, education and training, would that have been consistent with the experience and skills, education and training of an electrical engineer, to the best of your knowledge?

A. For an electrical engineer, yes.

Q. Did Mr. Baker, in your observation of him as his direct supervisor, exercise independent judgment?

A. Yes.

Q. And in what ways would he have done so?

A. He would basically be given a very broad knowledge of the particular fault or an

anomaly on a locomotive. And from there he would diagnose the problem with the train on his own.

Q. There was a notation in one of the documents regarding punctuality. I believe it was in -- I'll direct you specifically to Exhibit 13, ALS 367. You can look over my shoulders.

A. Yes.

Q. There is a reference in the very bottom -- I presume that to be in your handwriting -- captioned as punctuality, "needs much improvement."

A. Yes.

Q. Were there instances in which you afforded Mr. Baker certain accommodations regarding when he came in to work or when he was allowed to, for instance, leave work during the course of a business day?

A. Yes.

Q. And what were those circumstances?

A. Kevin had had child care issues, whether it was in the morning or in the evening, and I would immediately grant him the time off