## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEVIN PATRICK BAKER,      )
                              )
          Plaintiff,      )
                              )
        v.            )  Case No. 05-CV-1352 (RCL)
                              )
ALSTOM TRANSPORTATION, INC.,  )
                              )
         Defendant.    )
_____)

### MEMORANDUM IN SUPPORT OF
### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

#### A. Plaintiff's Claims

Plaintiff Kevin P. Baker alleges that Defendant ALSTOM Transportation, Inc. violated the Fair Labor Standards Act of 1938 as amended (FLSA), 29 U.S.C. §207(a), by unlawfully failing or refusing to pay him overtime pay for the overtime he worked as an Electrical Engineer during the period between April 14, 2002, and June 28, 2004.  See Complaint ¶¶48, 57.[1]

Defendant's defense essentially is that it properly classified Mr. Baker as exempt because he was a "professional" employee under the FLSA, 29 U.S.C. §213(a).  See Answer ¶¶14, 22, 29-33, 51; Def's Motion for Summary Judgment, Mem. at 2.

#### B. Relevant Procedural History

On November 1, 2005, plaintiff filed a Motion for Protective Order to prohibit defendant from issuing subpoenas to his current employers.  That motion is pending.

On November 10, 2005, plaintiff filed a Motion to Compel More Complete Responses to Plaintiff's First Set of Interrogatories and First Set of Requests for Documents ("Pl's Motion to

---

[1]  Because plaintiff verified the Complaint, it serves as a sworn affidavit for summary judgment purposes.

2

Compel").[2]  On November 28, 2005, defendant filed its Opposition to that motion.  On

December 1 plaintiff replied to that Opposition.  The motion is pending.

## II. STATEMENT OF FACTS

### A. Background

ALSTOM Transportation, Inc. is an American subsidiary of a company based in France.

Its headquarters is located in Hornell, N.Y.  Among other things, ALSTOM Transportation

manufactures and services locomotives, trains, and mass transit systems.  This case involves two

projects of ALSTOM:  the Northeast Corridor (NEC) project, servicing a high speed and the

AEM7 project, servicing Amtrak locomotives.  See Moses Dep. [Ex. 4 hereto] 13-17.

Plaintiff has Associates Degrees in Engineering Science from Onondaga Community

College, in Electronic Engineering Technology from Tidewater Community College, and in

Automotive Technology from City Colleges of Chicago.  He has no bachelor's or advanced

degrees.  Complaint ¶6; Baker Dep. [Ex. 2 hereto] 20-21, 24, 25, 27-29, 43-45, 56, 58, 63-64,

68-70.  Plaintiff earned 110 credits towards a bachelor's degree from SUNY Binghamton (also

known as Binghamton University), but did not have enough credits for the degree.  See Baker

Dep. [Ex. 2 hereto] 126-127; Ex. 10 hereto; Def. Resp. to RFA [Ex. 7], No. 2.[3]  Much of what

Mr. Baker knew was from his experience and on-the-job training.  Baker Dep. [Ex. 2 hereto]

197.

_____

[2]  The motion also suggested that the Court extend the deadlines for completing discovery and filing dispositive motions.  Earlier defendant did not agree to a joint motion to that effect.

[3]  As it did with many of its Responses to Plaintiff's Requests for Admissions, defendant neither admitted nor denied this statement.  See Ex. 7.  Therefore, the statement should be deemed admitted.  See Pl's Motion to Compel, Mem. at 20-21.

3

Virtually all plaintiff's prior jobs to working for defendant were as an electronics technician or test engineering specialist or in an equivalent position, assisting technicians or electrical or electronics engineers.  Baker Dep. [Ex. 2 hereto] 48, 63, 64, 68.  No matter whether he was paid hourly or a salary, he still received overtime pay for overtime work he performed.  All of plaintiff's prior positions were non-exempt.  Baker Dep. [Ex. 2 hereto] 47, 48-50, 51, 53, 63, 64.

In about 1997-99 plaintiff worked for Lockheed Martin as a production test technician and test engineering specialist in an hourly position.  Baker Dep. [Ex. 2 hereto] 68-69.  The position did not require any formalized educational training, such as a bachelor's degree.  Baker Dep. [Ex. 2 hereto] 70.  In fact, none of the positions which plaintiff held before working for ALSTOM required a bachelor's degree.  Baker Dep. [Ex. 2 hereto] 70.

### B.  Plaintiff's Work Through Tech/Aid

In 2000, Plaintiff applied for a position with ALSTOM as a temporary employee through Tech/Aid Corporation ("Tech/Aid"), a temporary placement agency.  Baker Dep. [Ex. 2 hereto] 94-98.[4]  A bachelor's degree was not required for the position, but was merely preferred.  Baker Dep. [Ex. 2 hereto] 122-123; Moses Dep. [Ex. 4] 34-35; Muscato Depo. [Ex. 5] 44.  In the application process, plaintiff represented that he had only associate's degrees, but not a bachelor's degree.  Baker Dep. [Ex. 2 hereto] 100-101, 121-122.  After a second interview, which included ALSTOM employees, Tech/Aid offered plaintiff a job as a technician for

---

[4]  ALSTOM uses temporary employees as a screening process to hire employees on its regular payroll, particularly in the Commissioning and Warranty Group.  Muscato Depo. [Ex. 5] 33.

4

ALSTOM.  Baker Dep. [Ex. 2 hereto] 104.  After he accepted the offer, Tech/Aid placed Mr.

Baker with defendant as a Technician in defendant's Philadelphia Acela Test and

Commissioning Site.  Plaintiff began working there on March 6, 2000.  Complaint ¶7; Baker

Dep. [Ex. 2 hereto] 95.

As a temporary employee with defendant, plaintiff acted only at the discretion and

direction of management.  Plaintiff did not have the authority to act without supervision.  Moses

Dep. [Ex. 4] 38.  He did not manage a budget or assets or supervise personnel.  Complaint ¶9;

Muscato Depo. [Ex. 5 hereto] 45-46.  His duties included troubleshooting, repairing, collecting

data, fault monitoring, and modifying of electro-mechanical devices.  Complaint ¶9; Baker Dep.

[Ex. 2 hereto] 107; Moses Dep. [Ex. 4] 32.

The tools plaintiff used included an oscilloscope, digital volt meter, HI-POT, chart

recorder, capacitance meter, and hand tools, including screwdrivers and wrenches.  Moses Dep.

[Ex. 4] 35, 38.  One would not need a college degree to operate an oscilloscope, HI-POT, chart

recorder, or capacitance meter.  One could learn to operate them in freshman college courses.

Moses Dep. [Ex. 4] 36-37.

Tech/Aid paid plaintiff at an hourly rate.  Complaint ¶8.  It paid plaintiff overtime pay for

hours he worked in excess of 40 each week.  Plaintiff's Answers to Defendant's First Set of

Interrogatories ("Pl. Int. Ans.") [Ex. 1 hereto], No. 3, p. 5.

C.  Defendant Hires Plaintiff as a Direct Employee

Between 2000 and 2004 Curtis Moses was ALSTOM's site manager in D.C.  Baker Dep.

[Ex. 2 hereto] 240.  Sometimes Gabriel Amar or Pete Dimola (new Project Operations Manager

5

& Eastern Regional Manager) ran the D.C. operation.  Baker Dep. [Ex. 2 hereto] 240.  At various times, between four and sixteen employees worked under Mr. Moses.  Moses Dep. [Ex. 4] 61.

During 2000 Mr. Moses realized that he needed more help in testing new locomotives and transits.  Mr. Moses needed someone with a "basic" electrical and electronic background. Moses Dep. [Ex. 4] 50.  He asked Operations Manager, Matt Rivera, for help.  Moses Dep. [Ex. 4] 43-45.  Mr. Moses did not tell Mr. Rivera that he needed someone with any kind of special degrees.  He needed someone with at least five years of experience.  Moses Dep. [Ex. 4] 52.[5]  He did not put his request in writing; nor is there any document that would reflect what Mr. Moses wanted for the position.  Moses Dep. [Ex. 4] 52.  See also Muscato Depo. [Ex. 5] 54.  Whenever he would provide input for a job posting for an electrical engineer, Mr. Moses would ask for a high school graduate with some type of electrical degree --associates or bachelor's.  Moses Dep. [Ex. 4] 102-103.

In September 2000 Mr. Rivera and Mr. Moses approached plaintiff about becoming an employee of ALSTOM, in the Commissioning and Warranty Group.  There was no vacancy announcement for the position.  Moses Dep. [Ex. 4] 47.  Also, plaintiff submitted no resume at that time because one was not required.  Pl. Int. Ans. [Ex. 1], No. 3, p. 7.

In September 2000, defendant interviewed plaintiff for a permanent position either as a salaried engineer or as an hourly technician.  Mr. Rivera conducted the interview.  Complaint ¶10; Answer ¶10.  During the course of the interview Mr. Rivera asked plaintiff if he had a

---

[5]  He was not aware of any qualification standards which ALSTOM's personnel office in New York had for electrical engineers.  See Moses Dep. [Ex. 4] 52-53.

6

degree.  Plaintiff reminded Mr. Rivera that he had associates degrees, but had not completed sufficient credits for a bachelor's degree.  Baker Dep. [Ex. 2 hereto] 126.  Mr. Rivera said that ALSTOM had a practice of accepting experience in lieu of education and that a bachelor's degree was not required for the position.  Baker Dep. [Ex. 2] 126.

At that interview, Mr. Rivera talked with plaintiff about his accepting a permanent position as either a salaried engineer or an hourly technician.  Mr. Rivera did not use the term, "electrical engineer"; he just said "engineer"; and he also used the term, "technician."  Baker Dep. [Ex. 2 hereto] 123-127.  He said plaintiff would be doing the same job he had been doing as a Tech/Aid temp, regardless of the title plaintiff chose.  Mr. Rivera encouraged plaintiff to accept the engineering position because management would look more favorably upon him and consider him for promotions and higher raises more quickly.  Mr. Rivera said that, even though he was a manager and salaried, he received overtime pay.  Baker Dep. [Ex. 2 hereto] 124-126.  Based on Mr. Rivera's representations about the position, plaintiff accepted the position as an engineer.  Complaint ¶14; Baker Dep. [Ex. 2 hereto] 164.

In October 2000, plaintiff received a formal offer letter from defendant.  Complaint ¶13.  Plaintiff signed the offer letter on October 27, 2000.  See Def. Ex. E.  The same day plaintiff signed an Employment Application with ALSTOM (Def. Ex. D).  Thus, plaintiff completed the application after defendant had already offered him the subject position.  See Baker Dep. [Ex. 2 hereto] 129, 134-135.

On October 28, 2000, defendant formally hired plaintiff as a permanent employee with the title of Electrical Engineer at an annual salary of $55,000. Complaint ¶15; Answer ¶15. His immediate supervisor was Curtis Moses.

### D.  Plaintiff's Duties as an ALSTOM Employee

Defendant assigned plaintiff primarily to the Acela Service Site in Washington, D.C. Complaint ¶16; Answer ¶16. When he became a direct employee of ALSTOM, plaintiff's duties did not change from those he had when he was a temporary employee. In fact, throughout his tenure he did the same type of work. Complaint ¶17; Baker Dep. [Ex. 2 hereto] 165-166.

The position did not require a bachelor's degree to do it well. Baker Dep. [Ex. 2 hereto] 237-238; Moses Dep. [Ex. 4] 89, 185. An associate's degree was preferred. Moses Dep. [Ex. 4] 108. The job was not highly specialized and unique: it could have been performed by any technician, including one with no high school diploma, who had some experience in that field. Baker Dep. [Ex. 2 hereto] 226, 227, 229. Many companies employ technicians performing similar duties. Baker Dep. [Ex. 2 hereto] 227.

### 1.  Plaintiff's Manual Labor

Mr. Baker never had a written job description or anything else in writing explaining his requirements. Baker Dep. [Ex. 2 hereto] 193; Muscato Depo. [Ex. 5] 56. His duties included reading e-mail, including reports from other sites and work directives from supervisors, managers, and customers; prioritizing assignments and determining equipment availability; requesting permission to work on customer's equipment; gathering tools; and traveling to the equipment's location. Pl. Int. Ans. [Ex. 1], No. 6, p. 12. When he reached the locomotives or

8

train sets, plaintiff conducted failure analysis, troubleshooting or diagnoses, replacement of failed components, testing, collecting data, and returning locomotives and trains in serviceable condition.  Baker Dep. [Ex. 2 hereto] 165-166.

Some of plaintiff's work was finding and solving "anomalies"; some was fixing "faults." Moses Dep. [Ex. 4] 25, 60, 76.  A "fault" was a problem which plaintiff could probably identify, by number, from a manual on the equipment; the manual would provide a repair procedure. Moses Dep. [Ex. 4] 78.  ALSTOM's French operations provided some 15 manuals, each about 300-400 pages long, which described in detail how its employees were to fix problems.  Moses Dep. [Ex. 4] 54-57.  For example, a manual would explain how to fix a fault in a locomotive or train set.  Moses Dep. [Ex. 4] 76-77, 184.  The manuals would contain figures or diagrams to help him locate the part and instructions on how to remove and replace the part.  If a locomotive stopped running well for a reason not described in the manual, the problem was considered an anomaly.  Moses Dep. [Ex. 4] 76.  A fault would be repaired by a technician; an anomaly usually required someone with little more electrical or electronic expertise.  Moses Dep. [Ex. 4] 78. However, fixing faults or anomalies did not require advanced knowledge.  Ex. 3, ¶5.  Fixing an anomaly could be as simple as rebooting a computer.  Most often he had no significant involvement in diagnosing anomalies because a solution required the expertise of an engineer from headquarters or the vendor.  *Id*.  Also, plaintiff had no involvement in diagnosing the anomaly or determining how to resolve the situation (which happened to be a design issue). Engineers at other locations, such as at Hornell, NY, or in France, most likely diagnosed the issue and drafted the instruction.  Ex. 3 ¶10.

9

Sometimes all plaintiff would do was go into a train, remove components which needed modification, and install new components. This removal and installation could range from 20% to 80% of the job. For instance, in November 2003, plaintiff was directed to replace capacitors on an entire fleet. He received a step-by-step procedure to follow to perform the assigned manual work. This assignment was representative of the work he performed. See Ex. 15 [ALS 3173-3252], Baker Affidavit [Ex. 3] ¶9. Other times plaintiff would follow a repair procedure contained in "how-to" manuals. Moses Dep. [Ex. 4] 54-57. However, on average, about 50% was doing paperwork, writing e-mails, and filing reports. Baker Dep. [Ex. 2 hereto] 242-243. Plaintiff can generally categorize his responsibilities at ALSTOM as 1) fixing faults, 2) fixing anomalies, and 3) performing modifications to equipment (commonly known as the removing and replacing of parts with improved ones). He spent the following percentages of his work time in each general responsibility: faults, 20%; anomalies, 20%; and modifications, 60%. Ex. 3 ¶3.

Plaintiff performed many menial tasks and considerable manual labor. Baker Dep. [Ex. 2 hereto] 241. He used many hand tools, including screwdrivers, wrenches, meters, electronic test equipment, and a laptop computer. Baker Dep. [Ex. 2 hereto] 242; Moses Dep. [Ex. 4] 38-39; Muscato Depo. [Ex. 5] 76, 86. ALSTOM provides courses on the service site for its employees on how to use the software or laptops needed to interface with locomotive and train sets. Moses Dep. [Ex. 4] 79-80. A typical course lasts about two weeks. Moses Dep. [Ex. 4] 79.

### 2. Plaintiff's Limited Self-Direction

Plaintiff's job was self-directed only to a limited extent. Baker Dep. [Ex. 2 hereto] 196, 200. For the most part, Mr. Moses prioritized plaintiff's tasks and, based on work orders from

customers and directions from Pascal Giroud, assigned him work on a daily basis.  Baker Dep.

[Ex. 2 hereto] 239-240; Moses Dep. [Ex. 4] 58-59, 75, 85-87, 109.

At the start of each day Mr. Giroud would indicate to Mr. Moses that he needed some

technical data from a locomotive, then Mr. Moses would align the resources needed to perform

the task.  Moses Dep. [Ex. 4] 59, 60.  See also Moses Dep. [Ex. 4] 91.  Mr. Moses would review

the train schedule and inform his counterpart in New York or Boston that he was going to have

someone investigate the train.  Moses Dep. [Ex. 4] 62.  Mr. Moses then assigned someone the

work based on the train schedule and the level of troubleshooting or investigation needed.

Moses Dep. [Ex. 4] 60-61, 87.  Mr. Moses made the assignments by daily reports, which he e-

mailed not only to plaintiff, but also to "mass distribution lists" of ALSTOM personnel in the

U.S., as well as in France.  Moses Dep. [Ex. 4] 65-66, 71-74.  The reports indicated what

equipment had what problem, who specifically had been working to solve the problem (e.g.,

plaintiff), who would be working on it, and where the work would be conducted.  Moses Dep.

[Ex. 4] 71-74.  At other times Mr. Giroud and others gave the directions.  Baker Dep. [Ex. 2

hereto] 239.  See, e.g., Ex. 3 ¶¶8, 9; Exs. 14, 15.

Once he was given the assignment, plaintiff, like any other competent technician, could

work without a supervisor's walking him through every step of a job.  Baker Dep. [Ex. 2 hereto]

196-197.  On rare occasions Mr. Moses would advise plaintiff about how to solve anomalies.

Moses Dep. [Ex. 4] 116-18.  Plaintiff would initiate work only after reading one of Mr. Moses's

daily reports, which would list assignments to be completed.  Moses Dep. [Ex. 4] 74-75; Baker

Dep. [Ex. 2 hereto] 201.  He did not often volunteer in this way; much more often Mr. Moses

11

would directly assign him the work.  Moses Dep. [Ex. 4] 75.  See also Moses Dep. [Ex. 4] 86-87;

Ex. 3, ¶7.  He consistently checked with a supervisor to prioritize what he had to do on a daily

basis.  Baker Dep. [Ex. 2 hereto] 201.

### 3.  Mentoring, not Supervisory Responsibilities

Plaintiff was not a supervisor under the FLSA (or any other statute).  Mr. Baker "didn't

supervise anyone."  Baker Dep. [Ex. 2 hereto] 203.  Mostly he worked alone.  Moses Dep. [Ex.

4] 97.  While he may have informed technicians on other shifts about where he left off on his

work, such as for turnover logs, see Moses Dep. [Ex. 4] 82-88, plaintiff did not have the

authority to evaluate any technicians to recommend raises or bonuses for technicians or to hire or

fire technicians, and he had minimal input, on inquiry from Mr. Moses, on promoting any

technicians.  Moses Dep. [Ex. 4] 92-94.  He occasionally mentored new employees.  Baker Dep.

[Ex. 2 hereto] 203-204.  When he helped train new employees, they would follow him around to

see what he did.  Baker Dep. [Ex. 2 hereto] 204.

Indicative of the fact that plaintiff did not actually supervise anybody, on plaintiff's 2002

evaluation, Mr. Moses wrote, "I feel that in a short period of time Kevin can excel at all aspects

of supervisory skills and customer relations."  Def. Ex. G.  He wrote that because he thought

that, with the departure of French expatriates, plaintiff would be able to pursue a promotion

within ALSTOM and would be supervising the technician staff more directly.  Moses Dep. [Ex.

4] 145.  During his 2003 evaluation session, plaintiff told Mr. Moses in effect that he would like

to be in a position where he could supervise other employees.  Mr. Moses responded that such a

promotion would be possible, with training, meaning some on-the job training.  Moses Dep. [Ex.

4] 96-97. Mr. Moses offered to mentor plaintiff to become a supervisor. Moses Dep. [Ex. 4] 97.

On plaintiff's 2002-2003 evaluation, Mr. Moses wrote that he had excellent technical abilities so

as "to become a lead engineer," but needed to increase his managerial skills to take advantage of

leadership opportunities in the future. Def. Ex. H (emphasis added); Moses Dep. [Ex. 4] 157-59.

On the same page Mr. Moses referred to plaintiff as "lead tech," not lead engineer. Def. Ex. H.

It was not until much later, in mid-2003, Mr. Amar informed plaintiff that he wanted him

to assume the Project Lead for the Maryland High Horsepower Locomotive Contract (which

involved the MARC trains). Mr. Moses documented Mr. Amar's instruction on August 14,

2003. Complaint ¶27; Pl. Int. Ans. [Ex. 1], p. 7; Moses Dep. [Ex. 4] 160-61.[6] However, plaintiff

still supervised no ALSTOM employees, and Mr. Moses remained the customer's first point of

contact, directed the work, coached plaintiff, and evaluated plaintiff, while Mr. Amar managed

the warranty aspect and controlled company assets. Complaint ¶27; Pl. Int. Ans. [Ex. 1], p. 8;

Moses Dep. [Ex. 4] 164-65.[7]

Also, plaintiff never had the authority to make policy for ALSTOM, to look for contracts

for ALSTOM, to decide the direction of the company, or to exert any authority or control over

the company's management. Moses Dep. [Ex. 4] 89-90; Muscato Depo. [Ex. 5] 89-90.

E. Defendant Suffered or Permitted Plaintiff to Work Overtime

Throughout his tenure with defendant, plaintiff's scheduled workweek was 40 hours per

week. Complaint ¶40; Answer ¶40. However, plaintiff "had absolutely no control" over his

---

[6] No document explains this assignment or what it entailed. Moses Dep. [Ex. 4] 161-62.

[7] Later Louis Gomes indicated that Mr. Amar and Mr. Moses did not have the authority to
promote plaintiff without his approval. Pl. Int. Ans. [Ex. 1], p. 8.

13

hours of work at ALSTOM.  Baker Dep. [Ex. 2 hereto] 238.  "It was out of control."  Baker Dep.

[Ex. 2 hereto] 238.  Sometimes he was in a position where he could not drop his tools at the end

of an eight-hour workday and go home.  Moses Dep. [Ex. 4] 160.  Sometimes, such as during

holidays or weekends, Mr. Moses specifically assigned plaintiff overtime work.  Moses Dep.

[Ex. 4] 165.  Also, plaintiff would work overtime to complete projects that he could not complete

during the regular workday.  Complaint ¶46.  He worked rotating shifts, nights, days, split shifts,

rotating days off, weekends, and holidays, through lunch, and at odd hours to fix a train.  Baker

Dep. [Ex. 2 hereto] 166-167.

Defendant suffered or permitted plaintiff to work the aforementioned overtime hours.

Complaint ¶45.  Defendant knew that plaintiff would have to work overtime to complete the

projects, because the work could not be completed in a normal eight-hour day, and defendant

knew that some of the procedures took a certain amount of time to complete.  Complaint ¶46;

Baker Dep. [Ex. 2] 181; Moses Dep. [Ex. 4] 109, 113.[8]  Also, defendant knew he worked these

hours because plaintiff submitted these hours on his bi-weekly (later weekly) timesheets.

Complaint ¶47; Moses Dep. [Ex. 4] 109-110.  Thus, Mr. Moses not only saw plaintiff working

overtime; he also knew of plaintiff's overtime from his time records and daily reports.  Moses

Dep. [Ex. 4] 109, 114, 120.

---

[8]  A committee composed of ALSTOM and its customers prepared a "relevancy work task"
document which indicated about how long it should take to troubleshoot anomalies and solve
them.  Moses Dep. [Ex. 4] 110-111.  The "Warranty Standard Task Times" table [Ex. 13 hereto],
which defendant provided plaintiff's counsel on December 23, 2005, may be the "relevancy
work task" document which Mr. Moses described during his deposition.

14

From January 2001 to August 2001, plaintiff often worked over nine hours a day, without a lunch break. Complaint ¶18; Def. Response to RFA [Ex. 7], No. 15. During that period, defendant paid plaintiff overtime pay for all of his overtime work. Complaint ¶18; Baker Dep. [Ex. 2 hereto] 239-249. Also see Moses Dep. [Ex. 4] 127, 145.

Defendant also awarded plaintiff compensatory time in lieu of some of the overtime work he performed. For example, defendant would give plaintiff the day off after working an extraordinarily long shift the previous work day. Pl. Int. Ans. [Ex. 1], No. 5, pp. 10-12. Moses Dep. [Ex. 4] 154-157, 165-166. As late as June 7, 2004, plaintiff took the day off as compensatory time for some of the overtime work he performed during that pay period. Pl. Int. Ans. [Ex. 1], No. 5, p. 12.

After August 2001 plaintiff often worked uncompensated overtime. Complaint ¶40; Pl. Int. Ans. [Ex. 1], pp. 7, 10. From August 2001 through December 2001, plaintiff worked nearly 160 hours of overtime, documenting the overtime hours on his timesheet. Complaint ¶21; Def. Resp. to RFA, No. 18; Pl. Int. Ans. [Ex. 1], p. 7. Beginning in August 2001, defendant ceased paying plaintiff for any of the many hours of overtime he was working. Complaint ¶22; Def. Resp. to RFA, No. 18; Pl. Int. Ans. [Ex. 1], p. 7.

On several occasions, management forced plaintiff to work overtime. He also knew that if he failed to stay and repair a locomotive, it could result in fines to ALSTOM from $3000-30,000 daily. ALSTOM told plaintiff that he would be paid for this overtime, either directly, as a bonus at the end of the project (which was in the near future), or by way of a raise. Pl. Int. Ans. [Ex. 1], No. 3, p. 8. For instance, in August 2003, Mr. Amar and Mr. Moses ordered

15

plaintiff to work overtime to repair a locomotive.  Mr. Amar informed plaintiff that he would

receive overtime pay as a bonus or a raise for doing this work.  Plaintiff did the requested

overtime work, but defendant did not compensate him for that overtime or for many other hours

of overtime which management ordered him to work.  Complaint ¶¶30-32; Pl. Int. Ans. [Ex. 1],

p. 8.

Jack Schroeder, Director of Commissioning and Warranty, asked Mr. Moses why Mr.

Baker was working overtime and at least once a month requested that Mr. Moses reduce the

overtime.  Moses Dep. [Ex. 4] 126-27.

### F.  Plaintiff's Overtime Records

From 2001 until he was terminated in June 2004, plaintiff kept records of the

uncompensated overtime hours he worked.  Complaint ¶48.  Plaintiff kept track of his hours on a

spreadsheet form which he could download from the ALSTOM/Hornell intranet.  Baker Dep.

[Ex. 2] 167.  Some other employees kept track of their hours the same way.  Baker Dep. [Ex. 2]

168-169.  He also observed managers and supervisors, including Curtis Moses, keeping track of

their hours on the job.  Baker Dep. [Ex. 2] 169.  Plaintiff recorded his regular and overtime hours

on his time records and submitted them weekly or biweekly.  Baker Dep. [Ex. 2] 244.[9]  Mr.

Moses signed the records, signifying that he approved of plaintiff's hours.  Ex. 8; Baker Dep.

[Ex. 2] 244, 246-247; Moses Dep. [Ex. 4] 120, 130.

---

[9]   A spreadsheet reflects the regular and overtime hours plaintiff worked per pay period.  See Ex.
9.

16

Although plaintiff was continuing to work overtime without compensation, in about February 2002, following directions from Mr. Schroeder, Mr. Moses ordered plaintiff not to include his overtime hours on his time sheet.  Complaint ¶23; Def. Resp. to RFA, [Ex. 7] No. 21; Baker Dep. [Ex. 2] 247, 249-250.  Also see Moses Dep. [Ex. 4] 132.  However, Mr. Moses allowed plaintiff to document the overtime he worked in the "comments" section of his timesheet.  Plaintiff did so.  Complaint ¶24; Answer ¶24; Baker Dep. [Ex. 2] 249-250.  This became common practice in D.C.  Baker Dep. [Ex. 2] 251.

In addition, on the self-appraisal portion of his performance evaluations, plaintiff made comments about his overtime.  See Def's Exs. G, H.  In April 2001, in anticipation of a performance review, plaintiff submitted his self-evaluation forms, on which he mentioned much of the overtime he worked for the benefit of the company.  Complaint ¶20; Pl. Int. Ans. [Ex. 1], No. 3, p. 7.  For example, on his February 2002 appraisal, plaintiff wrote: "I have placed a great deal of energy into this project (over 525 hours overtime in 2001).  Hopefully, my efforts have not gone unnoticed."  Def. Ex. G; Moses Dep. [Ex. 4] 141-143.

## G.  Plaintiff's Requests for Overtime Pay

Plaintiff had "numerous" conversations with Operations Manager Gabriel Amar, as well as with Mr. Rivera, Mr. Moses, and Mr. Dimola in which he expressed his dissatisfaction about not receiving overtime compensation.  Baker Depo. [Ex. 2] 179.  See also Pl. Int. Ans. [Ex. 1], No. 16, pp. 17-19.  He objected to working so much overtime –"between 15 and 25 hours of overtime each week, week in, week out."  Baker Depo. [Ex. 2] 180.  Acknowledging that overtime was required, Mr. Amar and other managers promised plaintiff overtime compensation

17

for the overtime he worked, but defendant broke these promises.  Complaint ¶26; Pl. Int. Ans.

[Ex. 1], No. 3, p. 7; Baker Depo. [Ex. 2] 180-181, Def. Resp. to RFA, [Ex. 7] No. 23.  On several

occasions Mr. Amar stated that he believed that plaintiff and other field personnel should be paid

overtime, since most all of them did the same work, adding that he felt that it was unfair for

some to be paid overtime and others not.  Pl. Int. Ans. [Ex. 1], No. 16, p. 19.

In March 2003, Mr. Amar stated at a meeting of employees that certain employees would

not be doing all the work and that all employees would have to work their share.  Complaint ¶28.

Afterwards, he privately told plaintiff that he was referring to him and that plaintiff would not

have to work as many overtime hours.  Complaint ¶29.  In reality, this was an empty promise,

because defendant continued to require plaintiff to work overtime without compensation.  *Id.*

H.  Defendant's Audit of Technician and Engineer Positions

In about 2003 defendant undertook a U.S.-wide audit of its Commissioning and Warranty

Department to make uniform all of its employees' responsibilities and to create a job level within

each job description.  Moses Dep. [Ex. 4] 168-69.  Defendant did this to insure that it met FLSA

requirements for defining exempt and non-exempt positions and was compliant with the law.

Muscato Depo. [Ex. 5] 22, 27-28.  Defendant explained the audit in e-mails throughout the

company.  Muscato Depo. [Ex. 5] 23-24.[10]  Included in the audit were company interviews of

department employees conducted by Louis Gomes.  See Baker Dep. [Ex. 2 hereto] 187; Muscato

Depo. [Ex. 5] 108-109.

---

[10] Despite frequent requests, starting with Mr. Muscato's deposition on November 17, defendant has not produced the documents.  See Ex. 11.

18

In November 2003, Mr. Amar informed plaintiff that defendant's Human Resources department was in the process of reviewing all of the Field Services job descriptions and pay structures and that defendant would pay overtime pay to <u>all</u> field engineering personnel as non-exempt employees.  Complaint ¶33.  See also Baker Dep. [Ex. 2] 180-181.  However, defendant did not later compensate plaintiff for all his overtime work.  Complaint ¶34.

In about December 2003, Mr. Gomes interviewed plaintiff by phone.  He inquired into plaintiff's duties, work, and educational background.  Baker Dep. [Ex. 2] 187-192, 194-204.  See also Muscato Depo. [Ex. 5] 108.  Mr. Gomes memorialized his impressions about the phone conversation in a job audit document.  Def. Ex. I.  The document contained mischaracterizations of plaintiff's statements, including the notion that plaintiff had a bachelor's degree (Baker Dep. [Ex. 2] 194-196) [11] and that he alone prioritized his work (Baker Dep. [Ex. 2] 200-201). [12]

In March 2004, Mr. Dimola asked plaintiff and all other salaried personnel of the Northeast Corridor Project to submit records of all of their hours of overtime worked in fiscal years 2002-2003.  Complaint ¶35; Answer ¶35; Baker Dep. [Ex. 2 hereto] 244-245.  Plaintiff did so and also submitted records documenting those hours.  Complaint ¶36; Answer ¶36.  The records revealed that during those two fiscal years plaintiff worked 1212 hours of overtime and that defendant had not compensated him for that overtime.  Complaint ¶37; Pl. Int. Ans. [Ex. 1], No. 3, pp. 8-9.  Even after plaintiff submitted his records to Mr. Dimola, defendant still did not

---

[11]  Plaintiff told Mr. Gomes that he studied for a bachelor's degree at Binghamton, but had not graduated.  Baker Dep. [Ex. 2 hereto] 195-96.
[12]  However, the document also indicated that there was "nothing in writing" about a promotion for plaintiff and that his promotion was "pending."  Def. Ex. I; Moses Dep. [Ex. 4] 180.  That confirmed that plaintiff had not yet been promoted to supervisor.

19

compensate him for any of the overtime he worked during the two fiscal years. Complaint ¶38; Pl. Int. Ans. [Ex. 1], No. 3, p. 9.

Defendant terminated plaintiff on June 28, 2004. Complaint ¶43. Plaintiff's last annual salary was $59,858. Complaint ¶44; Answer ¶44. Except for the period of January-April 2001, defendant did not pay plaintiff for his overtime work with overtime pay at 1.5 times his regular hourly rate. Complaint ¶49; Pl. Int. Ans. [Ex. 1], No. 5, p. 10. During his employment with defendant, plaintiff worked over two thousand hours of uncompensated overtime for defendant to complete projects within deadlines. Complaint ¶41; Pl. Int. Ans. [Ex. 1], No. 3, p. 9.

## I. Defendant Paid Overtime to Similarly Situated D.C. Employees

By contrast, defendant paid overtime pay to other salaried personnel who had bachelor's degrees (such as Saluka Kulasinghe, who was also a field service engineer/electrical engineer with the same duties as plaintiff, and Kofiowusu Ansah, who was a field service technician). Baker Dep. [Ex. 2] 172-173; Def. Response to RFA [Ex. 7], Nos. 36, 37; Ex. 12. Defendant paid them overtime compensation with checks $5,000 or more and reclassified then as "non-exempt." Complaint ¶39; Answer ¶39; Pl. Int. Ans. [Ex. 1], No. 5, p. 9; Moses Dep. [Ex. 4] 170-72.

Defendant also paid overtime to several other employees working in a position defendant classified as "exempt," such as Mr. Moses and Donalds Allen, both site Operations Managers. See Ex. 16.

20

III.  ARGUMENT

A.  Applicable Principles

The Court, of course, is familiar with the standards for considering motions for summary

judgment:

> Under Rule 56(c) of the [F.R.C.P.], summary judgment is to be granted only "if the
> pleadings, depositions, answers to interrogatories, and admissions on file together with
> the affidavits, if any, show that there is no genuine issue as to any material fact and that
> the moving party is entitled to judgment as a matter of law.  The district judge, in ruling
> on a summary judgment motion, must assume the truth of the nonmovant's evidence, and
> draw all justifiable inferences in that party's favor.

*Bayer v. United States Dep't of the Treasury*, 294 U.S. App. D.C. 44, 956 F.2d 330, 333 (1992),

*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  *Accord, Lytle v. Household*

*Mfg., Inc.*, 494 U.S. 545, 554-555 (1990).

The As the Court is fully aware, "the judge's function is not himself to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson*, 477 U.S. at 249.  Furthermore, a "party is only entitled to summary judgment if the

record, viewed in the light most favorable to the nonmoving party reveals that there is no

genuine issue as to any material fact," *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288

(D.C. Cir. 1998) (*en banc*), *citing Tao v. Freeh*, 307 U.S. App. D.C. 185, 27 F.3d 635, 638

(1994).  "'Summary judgment will not lie if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'"  *Aka*, 156 F.3d at 1288, *quoting Anderson*, 477 U.S.

at 248.  The Supreme Court has affirmed this approach: "Summary judgment, . . . . is

appropriate only where there is no genuine issue of material fact and the moving party is entitled

21

to judgment as a matter of law." *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 1550 (1999). In considering summary judgment motions, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), *citing Anderson*, 477 U.S. at 255.

By virtue of Rule 56(f), summary judgment cannot be granted when it is shown that discovery on essential facts relevant to the motion has not been completed. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (summary judgment appropriate only "after adequate time for discovery"); *Anderson v. Liberty Lobby*, 477 U.S. at 257; *Athridge v. Rivas,* 141 F. 3d 357, 362 (D.C. Cir. 1995) ("Fed. R. Civ. P. 56(f) . . . 'allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.' *Celotex,* 477 U.S. at 326."); *First Chicago Intern. v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988).

Finally, the Court's local rules place certain requirements on the parties. LCvR 56.1 provides:

> Each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement.

See also LCvR 7(h). Here, defendant has made it difficult to parse through which facts are undisputed. A separate statement of facts would serve the interests of the rule and help the Court decide this motion for summary judgment more efficiently. *Argueta v. District of Columbia*, 355

22

F.Supp.2d 408, 413 (D.D.C. 2004) (Lamberth, J.).  *See also Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F.Supp.2d 1, 5 (D.D.C. 2003).

### B.  Defendant Suffered or Permitted Plaintiff to Work Overtime

Here, as shown above, it is clear beyond any doubt that plaintiff worked overtime for defendant and that defendant suffered or permitted him to work overtime.  Defendant constantly assigned plaintiff not only work which required him to work overtime to complete, but also work which specifically had to be performed on overtime and, rather than discouraging him from working overtime, management continued to assign him overtime.  See pp. 13-17 above.  Plaintiff kept very good records of his overtime hours (Ex. 8 hereto; Baker Dep. [Ex. 2 hereto] 167, 244, 246-247), which he regularly submitted to his supervisor and ALSTOM's payroll department.  See pp. 15-16, 18 above.  Defendant not only observed plaintiff working overtime, but also saw his time records of his overtime hours.  See above, pp. 13-16.

For a period of some eight months (January-August 2001), defendant paid plaintiff overtime at 1.5 times his regular wages.  See p. 13 above.  By paying plaintiff overtime pay, defendant tacitly recognized that he was no longer, if ever, an FLSA-exempt employee.[13]  In any event, it is undisputed that defendant did pay plaintiff overtime for overtime worked between January and August 2001.[14]

Defendant has no evidence, documentary or testimonial, to refute plaintiff's abundant evidence that he worked considerable overtime.  Indeed, records which plaintiff kept and

---

[13]  *Cf. Bolduc v. National Semiconductor Corp*, 35 F. Supp. 2d 106, 115 (D. Me. 1998) (employer paid plaintiff on an hourly basis).
[14]   Defendant does not address this at all in its motion.

submitted to defendant showed that during the period between April 14, 2002, and June 28, 2004,[15] plaintiff worked 1365 overtime hours without receiving overtime pay for them. Accordingly, unless plaintiff was exempt from overtime under one of the recognized exemptions,[16] defendant violated the FLSA, 29 U.S.C. §207(a), by knowingly, willfully, and continuously failing to pay plaintiff overtime pay for his overtime work in the activities described above, for the period between, and inclusive of, April 14, 2002, and June 28, 2004.  As the Court explained in *Robinson-Smith v. GEICO*, 323 F.Supp.2d 12, 17 (D.D.C. 2004).

> Section 207(a) of the Fair Labor Standards Act provides that employees are to be paid at a rate of one and one-half times their "regular rate" for hours worked in excess of 40 in one week, unless they are subject to certain exemptions enumerated in Section 213.  29 U.S.C. § 207(a).

## C.  Plaintiff Was Not an "Exempt" Employee

Defendant argues that plaintiff was exempt from the overtime provisions of the FLSA because he was a "professional" employee.  The applicable Department of Labor (DOL) regulation, 29 C.F.R. §541.3 (2001), defines "professional" employee as follows:[17]

> The term employee employed in a bona fide * * * professional capacity in section 13(a)(1) of the Act shall mean any employee:

> (a) Whose primary duty consists of the performance of:

> (1) Work requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship,

---

[15]  Plaintiff claims a limitations period of three, not two, years before he filed this suit, see Complaint ¶¶57, 58(a), because defendant's overtime violations were willful.  See Part E below.

[16]  The overtime provisions of Section 207 do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

[17]  The language of this regulation remained in effect throughout all of plaintiff's claimed back pay period.  DOL made changes in the regulations after he left defendant's employ.

24

and from training in the performance of routine mental, manual, or physical processes, * * * and

(b) Whose work requires the consistent exercise of discretion and judgment in its performance; and

(c) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and

(d) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in paragraphs (a) through (c) of this section; and

(e) Who is compensated for services on a salary or fee basis at a rate of not less than $170 per week.

"As with other exemptions, the essence of this test is to determine the plaintiff's chief or principal duty. *Paul v. Petroleum Equipment Tools Co.*, 708 F.2d 168, 170-71 (5th Cir. 1983)." *Leslie v. Ingalls Shipbuilding, Inc.*, 899 F.Supp. 1578, 1582 (S.D. Miss. 1995). *See also Bolduc v. National Semiconductor Corp.*, 35 F. Supp. 2d 106, 113 (D. Me. 1998) ("A determination of whether an employee is exempt under the FLSA requires an examination of the day-to-day work of an employee."). "Whether or not a position is exempt from the overtime requirement is a mixed question of law and fact." *Bolduc*, 35 F. Supp. 2d at 114, citing *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1073 (1st Cir. 1995).

Considering the above-quoted regulation and the cases interpreting it, the Court should reject defendant's argument for the following reasons:

It is settled that the employer "has the burden of proving such exemption." *Danesh v. Rite Aide of Washington, D.C., Inc.*, 39 F.Supp.2d 7, 10 (D.D.C. 1999), *citing Corning Glass*

25

*Works v. Brennan*, 417 U.S. 188, 196-97 (1974). *See also Donovan v. Nekton, Inc*., 703 F.2d 1148, 1151 (9th Cir. 1983) (*per curiam*). The FLSA was enacted by Congress as a remedial act and, therefore, its exemptions must be narrowly construed. *See Arnold v. Ben Kanowsky, Inc.*. 361 U.S. 388, 392 (1960). "Moreover, exemptions from the Act are narrowly construed against the employer 'in order to further Congress's goal of affording broad federal government protection.' *D'Camera v. District of Columbia*, 693 F. Supp. 1208, 1210 (D.D.C. 1988) (citing *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207, 211 (1959))." *Danesh*, 39 F.Supp.2d at 10. Accordingly, "[t]he exemptions enumerated in Section 213 'are to be narrowly construed against the employers seeking to assert them' and are to be 'limited to those establishments plainly and unmistakably within their terms and spirit.' *Arnold v. Kanowsky*, 361 U.S. 388, 392 (1960); *see also Prakash v. American University*, 727 F. 2d 1174, 1178 (D.C. Cir. 1984) (noting that the "bona fide professional capacity" exemption is to be construed narrowly)." *Robinson-Smith v. GEICO*, 323 F.Supp.2d at 177. *See also Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000); *McCune v. Or. Senior Servs. Div*., 894 F.2d 1107, 1109 (9th Cir. 1990) (citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). Further, "as the movant for summary judgment, [defendant] has the additional burden of showing the absence of a genuine dispute about any material facts." *Bolduc*, 35 F.Supp. 2d at 114.

Although it is uncontroverted that plaintiff met the salary test of the Department of Labor regulations, 29 C.F.R. §541.3(e), he was <u>not</u> exempt as a "professional" under the FLSA, 29 U.S.C. §213(a), because his position did not require "knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual

26

instruction" (29 C.F.R. §541.3(a)(1)); because it did not require "consistent exercise of discretion and judgment" (*id.* at (a)(2)); and because it was not "predominantly intellectual and varied in character" (*id.* at (a)(3)).

Defendant has also produced no document which would explain its contemporaneous thought processes in classifying plaintiff as exempt.  ALSTOM has not produced any advertisement or job posting which elicited plaintiff to apply for his ALSTOM job.  It is undisputed that in about September 2000 defendant approached plaintiff about working for it directly.  Therefore, he did not respond to any job posting. See p. 5 above.[18]  Nor did ALSTOM give Mr. Baker a job description or anything else explaining his requirements in writing (Baker Dep. [Ex. 2 hereto] 193) and has not produced a position description which applied to <u>his</u> job.[19]  Mr. Muscato, defendant's 30(b)(6) witness on the classification issue (Muscato Depo. [Ex. 5] 11), joined ALSTOM several years after it hired plaintiff, had no direct information about why defendant regarded plaintiff as exempt, and could merely speculate on why it did so.  See Muscato Depo. [Ex. 5] 9, 36, 40, 55, 72.  Accordingly, to determine whether plaintiff was indeed exempt as a "professional" employee, the Court must look to the facts surrounding defendant's hiring plaintiff and examine the work he actually did. *See Schaefer v. Indiana Mich. Power Co.*,

---

[18]   Defendant merely produced a posting for a <u>different</u> job [Def. Ex. B], which was posted three months after he was hired and which may or may not have had the same requirements as Mr. Baker's job.  Def. Ex. B; Baker Dep. [Ex. 2 hereto] 143-148.

[19]   Defendant produced a position description for an Engineering Test Specialist, dated October 29, 2003 (Def. Ex. K), which was not for plaintiff's job.  Moses Dep. [Ex. 4] 104-105.  See also Pl. Statement, No. 18, p. 13.

358 F.3d 394, 400 (6th Cir. 2004) ("We focus on evidence regarding the actual day-to-day
activities of the employee . . . .").

     As explained above, defendant initially hired plaintiff through a temporary agency for a
position which did not require a bachelor's degree. Baker Dep. [Ex. 2] 122-123; Muscato Depo.
[Ex. 5] 44; Moses Dep. [Ex. 4] 34-35. Plaintiff informed both Tech/Aid and ALSTOM that he
had <u>only</u> associate's degrees, but not a bachelor's degree. Baker Dep. [Ex. 2] 100-101, 121-
122.[20] Undisputed evidence, including testimony from defendant's 30 (b)(6) witnesses,
establishes that a bachelor's degree was not required for this position; it was merely preferred.
Baker Dep. [Ex. 2 hereto] 122-123; Muscato Depo. [Ex. 5] 44; Moses Dep. [Ex. 4] 34-35, 89.[21]
See also Baker Dep. [Ex. 2 hereto] 122-123, 237-238, Muscato Depo. [Ex. 5] 36. When Mr.
Moses requested that the position be filled, he did not tell Mr. Rivera that he needed anyone with
any special degree (p. 5 above);[22] he just said he needed someone with at least five years'
experience; and Mr. Rivera hired plaintiff with the knowledge that he only had associates
degrees (pp. 4-6 above).

     The fact that a bachelor's was not required for the position is critical. "A relevant
academic degree serves as prima facie evidence of the possession of professional training."

---

[20]  While the application indicates that someone wrote that he had completed a BSEE degree at
SUNY Binghamton (<u>id</u>.), plaintiff recalls that he left blank the "yes" and degree blocks on the
same lines as "SUNY Binghamton," that some of the handwritten inserts did not resemble his
handwriting, and he did not recall exactly what he put on the application. Baker Dep. [Ex. 2
hereto] 131-133.
[21] Even on defendant's cross, Mr. Moses testified, "It would be useful, but not essential." Moses
Dep. [Ex. 4] 185.
[22]  He did not put his request in writing; nor is there any document that would reflect what Mr.
Moses wanted in an electrical engineer. Moses Dep. [Ex. 4] 52.

*Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 543 (7th Cir. 1999), citing 29 C.F.R.

§541.301(e)(1). As stated in *Bolduc*, "The core requirement of the learned professional

exemption is that the duties of the position call for a person who is in a 'learned profession' with

at least a college degree in a specialized type of learning." 35 F.Supp.2d at 114, citing 29 C.F.R.

§ 541.30[1](a); *Dybach v. State of Florida Dep't. of Corrections*, 942 F.2d 1562, 1565 (11th Cir.

1991) (determinative factor for professional exemption is that the job require a special degree

and not the education in fact acquired by the employee). That an advanced degree, let alone a

bachelor's degree, was not required for this position shows that the work did <u>not</u> "require[e]

knowledge of an advance type in a field of science or learning customarily acquired by a

prolonged course of specialized intellectual instruction and study, as distinguished from a

general academic education and from an apprenticeship, and from training in the performance of

routine mental, manual, or physical processes" (29 C.F.R. §541.3(a)(1)). Although plaintiff

possesses only associate's degrees, not a bachelor's or an advanced degree, he was able to do his

job well. See above, pp. 7, 10; Def. Exs. G, H. Plaintiff obtained the knowledge to do his job

well through experience, not education. See Baker Dep. [Ex. 2 hereto] 197, 227; Muscato Depo.

[Ex. 5] 84.

  Moreover, plaintiff's primary work was more like a technician's. As he explained, the

job was not highly specialized and unique; it could have been performed by any technician who

had some experience in that field and was not typical of a professional engineer. Baker Dep.

[Ex. 2 hereto] 226, 227; Pl. Int. Ans. [Ex. 1], No. 3, p. 9. *See Reich*, 44 F.3d at 1075 ("whether

an employee is an exempt professional is independent of the title the employer ascribes to the

position."). It was <u>not</u> work which was "predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and [was] of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time," under the DOL regulations, 29 C.F.R. §541.3(c). It is undisputed that after defendant hired him directly, plaintiff continued to perform the same type of work. See Complaint ¶17; Baker Dep. [Ex. 2 hereto] 165-166. He had to use his mind, but he also had to use his hands. It is also undisputed that plaintiff performed many menial tasks and many tasks of manual labor, hand tools, including screwdrivers, and wrenches, meters, electronic test equipment, and a laptop. Baker Dep. [Ex. 2 hereto] 241-242. As Mr. Moses stated, one would not need a college degree to operate an oscilloscope, HI-POT, chart recorder, or capacitance meter; their use is taught in freshman college courses. Moses Dep. [Ex. 4] 36-37. Removal of faulty parts and installation of new equipment could be 80% of his time; sometimes that could be only 20% of the job. Baker Dep. [Ex. 2 hereto] 243. At least some of the work was routine and he needed to consult as many as 15 very detailed manuals to determine how to fix "faults" in the systems. See Baker Affidavit ¶6; pp. 8-9 above. The "mere fact that [plaintiff] has extensive knowledge of the [work is not] sufficient to turn their application into exercises discretion and independent judgment." *Schaefer*, 358 F.3d at 405. As the Court of Appeals also stated in *Schaefer*, *id.*,

> 29 C.F.R. § 541.207(c)(3) specifically states that "often, after continued reference to written standards, or through experience, the employee acquires sufficient knowledge so that reference to written standards is unnecessary. The substitution of the employee's memory for the manual of standards does not convert the character of the work performed to work requiring the exercise of discretion and independent judgment."

30

Rather, [the plaintiff] "merely applies his knowledge in following proscribed procedures or determining which procedures to follow" and "determines whether specified standards are met." 29 C.F.R. §541.207(c)(1).

Third, the job did not <u>consistently</u> require the exercise of discretion and judgment. Baker Dep. [Ex. 2 hereto] 238. Plaintiff was somewhat self-directed, but he did not operate without supervision. Baker Dep. [Ex. 2 hereto] 203, 239. Thus, defendant had many layers of supervision; plaintiff's work orders emanated from customers to managers who were one or two levels higher even than plaintiff's supervisor, Mr. Moses; and Mr. Moses generally gave plaintiff his orders of the day, through daily reports that Mr. Moses e-mailed throughout the company's system. See p. 8 above. Plaintiff would initiate work only by reading one of Mr. Moses's daily reports. Moses Dep. [Ex. 4] 74-75; Baker Dep. [Ex. 2 hereto] 201. He did not often volunteer in this way; much more often Mr. Moses would directly assign him the work. Moses Dep. [Ex. 4] 75. See also Moses Dep. [Ex. 4] 86-87. Like any other competent technician, plaintiff learned to work without constant guidance, though on rare occasions Mr. Moses or others would give him advice on how to fix anomalies. Baker Dep. [Ex. 2 hereto] 196-197; Moses Dep. [Ex. 4] 116-18. Further, while plaintiff may have worked independently, it is clear that he did not supervise any ALSTOM employees and at most mentored new employees and guided customers' employees. See pp. 11-12 above.[23] Accordingly, defendant cannot show that plaintiff's "work require[d] the consistent exercise of discretion and judgment in its performance" (29 C.F.R. §541.3(b)). *See Barth v. Wolf Creek Nuclear Operating Corp.*, 125 F.Supp.2d 437, 443 (D.Kan. 2000) (court denied employer's summary judgment motion where <u>engineer-employees</u> did not consistently

---

[23] That plaintiff wrote daily reports did not make him a supervisor or professional; technicians also wrote them. Moses Dep. [Ex. 4] 81.

31

exercise discretion and judgment and instead followed standardized written procedures).

Fourth, as explained above (pp. 8-10), at least 20%, and as much as 80%, of his work involved the physical labor of removing faulty equipment and installing new or repaired equipment. This work is not representative of the duties of a professional engineer. In the circumstances, the Court should not find that plaintiff was a bona fide "professional" employee within the meaning of the FLSA, 29 U.S.C. §213(a)(1), or the DOL regulations, 29 C.F.R., Part 541. See *Dybach*; *Barth*; *Bolduc*. As the Court has stated, "In order to claim exempt status under the FLSA, an employer must meet every aspect of the definition for an exempt employee." *D'Camera*, 693 F.Supp. at 1213. *See also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002) ("[t]he criteria provided by [the] regulations are *absolute* and the employer must prove [by clear and convincing evidence] that any particular employee meets *every* requirement before the employee will be deprived of the protection of the Act" (emphasis added)).

### D. Defendant's Defenses Lack Merit

Defendant repeatedly makes conclusional statements (*e.g.*, that the position "required shared knowledge" and was "highly specialized with absolutely no margin of error" [Def. Mem. at 19]) without referring to any admissible evidence to support its contention, and even when its arguments cite record references, they lack merit.

Defendant asserts that plaintiff " acknowledged that his position with ALSTOM was as an overtime exempt Electrical Engineer by affixing his signature to the letter and returning a copy of it to ALSTOM." Def. Mem. at 18. To the extent that defendant is trying to argue that plaintiff somehow waived his FLSA overtime rights by signing the offer letter, it is plainly

32

wrong.  *See Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728, 740 ("This Court's

decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an

individual employee's right to a minimum wage and to overtime pay under the Act."); *Brooklyn*

*Savings Bank v. O'Neil*, 324 U.S. 697 (1945).  *See, e.g.*, *Schaefer*, 358 F.3d at 400-01 ("Neither

the job description that Schaefer wrote for his resume nor Schaefer's failure to dispute AEP's

position descriptions or performance evaluations prior to this lawsuit preclude him from arguing

that his day-to-day activities differ from those described in these documents - such actions

merely raise credibility questions for the factfinder.").

       Defendant contends that plaintiff's "position needed to be occupied by someone who

could perform work that required advanced knowledge."  Def. Mem. at 19.  The contention lacks

merit for the reasons shown above, pp. 7-9.  Next, defendant asserts, "By its nature, the work

necessary to maintain and repair high-speed trains (AMTRAK in particular), is highly

specialized with absolutely no margin for error, given the well recognized safety considerations."

*Id.*[24]  Defendant provides no record reference for this assertion, for there is none.  While no one

would deny that it is very important to operate trains safely, it is a leap to place the entire

---

[24]  Defendant gains nothing by trying to support this sentence by pointing out, "Mr. Baker was
able to parlay his skills, training and experience with ALSTOM to secure his current AMTRAK
position."  Def. Mem. at 19 n. 24.  This is an absurd irrelevancy.  What counts, of course, is what
expertise ALSTOM required for the subject position, not what a later employer needed.  Indeed,
Mr. Muscato, one of defendant's 30(b)(6) witnesses, testified that it would make no difference to
him if plaintiff's current employers classified him as non-exempt!  See Muscato Depo. [Ex. 5]
76.

33

responsibility of maintaining AMTRAK trains on plaintiff![25]

Defendant then asserts that "ALSTOM's *Job Posting* specified certain professional traits that applicants for the Electrical Engineer were required to possess." Def. Mem. at 19. However, at best that job posting (Def's Ex. B) sought applicants for a <u>similar</u> position, since it is undisputed that it was not the posting for plaintiff's job. See Baker Dep. [Ex. 2 hereto] 143-148; Moses Dep. [Ex. 4] 47. Indeed, plaintiff does not recall seeing <u>any</u> posting for his regular ALSTOM job. See Baker Dep. [Ex. 2 hereto] 144, 146-147. Similarly, defendant has no record support for its assertion, "Applicants, like Mr. Baker, were also informed that the position required a "bachelor's or higher degree in Electrical Electronic, or other appropriate engineering field." Def. Mem. at 20, citing its Statement ¶3 and its Ex. B.[26] Actually, as shown above and in Plaintiff's Response to "Defendant's Statement Of Relevant And Undisputed Facts" ["Pl. Resp."] ¶3 at 2-3, both before it hired him as a temporary employee through Tech/Aid and before it hired him directly, plaintiff informed defendant that he had no bachelor's degree, and Mr. Moses did not request a college graduate for the regular position.

---

[25] The fact that an employee might be in a dangerous occupation does not necessarily make the position "professional." For example, in *Schaefer*, plaintiff was an environmental specialist who handled radioactive material; in *Cunningham v. Gibson Electric Co., Inc.*, 43 F. Supp. 2d 965 (N.D. Ill. 1999), the plaintiff was an electrical engineer; and in *Ragnone v. Belo Corp*., 131 F.Supp.2d 1189 (D.Or. 2001), the plaintiff was a helicopter pilot. All were held to be non-exempt.

[26] Plaintiff responds to Defendant's Statement of relevant and Undisputed Facts in the accompanying Response. While plaintiff concedes a few of the recitations in Defendant's Statement, for the most part it is rife with false and exaggerated contentions which are not supported by any evidence or at least are not supported by uncontradicted evidence. Paragraph 3 of Defendant's Statement is a prime example of that.

34

Defendant notes that "Mr. Baker's professed experience and training easily surpassed these standards." Def. Mem. at 20, citing its Statement ¶¶6, 13; Def. Ex. G. It is true that plaintiff had far more than five years of experience in electronics and engineering work, but what matters is the expertise required by the position, not the expertise brought to it by the employee. The fact that an incumbent might hold a college degree does not make the position exempt under the professional exemption; the issue is whether the position requires advanced knowledge in a field of science or learning. *See Debejian v. Atlantic Testing Labs., Ltd*., 64 F.Supp.2d 85 (N.D.N.Y. 1999); 29 C.F.R. §541.301(e)(2) (2001); *Blomgren v. Gibbs & Hill*, 7 WH Cases 279, 282 (S.D.N.Y. 1947) (possession of engineering degrees by more than half the incumbents did not make the job exempt). As Mr. Muscato testified, ALSTOM classifies the position, not the employee. See Muscato Depo. [Ex. 5] 92.[27] Also, Defendant's Statement ¶13 and Defendant's Ex. G both refer to tasks which plaintiff performed well after he started work as a regular employee in 2000 and thus long after defendant classified him as exempt.

Defendant then attempts to boot-strap an exemption based on a strawman about plaintiff's education. Thus, defendant asserts, "Mr. Baker also represented that he held a bachelor of science degree in Electrical Engineering." Def. Mem. at 20, citing its Statement ¶¶4, 7; Def's Ex. D. This is a false statement. See pp. 4, 6 above; Pl. Resp. ¶4 at 3-4. Also, plaintiff completed the application (Def's Ex. D) after defendant had already offered him the subject position with an offer letter which purported to classify his position as exempt. See above, p. 6;

---

[27] Mr. Muscato testified, "Each individual position description and what's written on it from a responsibility perspective, interaction, challenges, discretionary authority, those are the items that define exempt or non-exempt." Muscato Depo. [Ex. 5] 92.

35

Baker Dep. [Ex. 2 hereto] 129, 134-135.  Defendant further argues, "In addition to his purported

B.S. degree in Electrical Engineering, Mr. Baker possessed separate Associates Degrees from

Tidewater Community College in Electronic Engineering Technology and from Onondaga

Community College in Electrical Science."  Def. Mem. at 20, citing its Statement ¶7.  However,

these associates' degrees do not add up to a bachelor's; ultimately plaintiff fell five credits short

of qualifying for a B.S.  See above, p. 6, Baker Dep. [Ex. 2] 127; Ex. 10.  In any event, the courts

understand that "resumes may not provide the most accurate picture of an employee's job

because resumes are typically 'designed to enhance the employee's duties and responsibilities in

order to obtain a job.'"  *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 689 n. 2 (6th Cir. 2001).

*Accord*, *Schaefer*, 358 F.3d at 400 ("We focus on evidence regarding the actual day-to-day

activities of the employee rather than more general job descriptions contained in resumes,

position descriptions, and performance evaluations.").

 Next defendant argues, "The actual duties and responsibilities of Mr. Baker's position

also confirm his status as a professional employee."  Def. Mem. at 20.  This argument clearly

lacks merit, for the reasons stated above (pp. 7-12).  Nor is there any record support for

defendant's highly editorialized six-line summary of plaintiff's duties, set out at Def. Mem. at

20-21.  Plaintiff performed many of the itemized duties, but defendant exaggerates them.  See Pl.

Response ¶¶13, 15, 18; pp. 7-9 above.  Defendant further inflates plaintiff's skills out of

proportion by stating that his "skills were such that he was elevated to a position wherein he was

tasked with additional responsibilities that required even greater knowledge of an advanced

type."  Def. Mem. at 21, referring to Def. Statement ¶¶13, 15, 18.  Defendant obviously uses the

36

word, "advanced," to suggest that plaintiff had "advanced" knowledge within the meaning of 29 C.F.R. §541.3(a)(1), but plaintiff, of course, did not have even a bachelor's degree. Also, as explained above (pp. 11-12), see also Pl. Resp. ¶10 at 10, defendant never actually promoted plaintiff, and there is no evidence to support defendant's contention that it gave him "responsibilities that required even greater knowledge of an advanced type."

Defendant quotes plaintiff on how "intellectually challenging his position was as an Electrical Engineer." Def. Mem. at 21. The quote is out of context. Plaintiff testified that "the most difficult" challenge of his job, aside from the "long hours and some of the manual labor that was involved," was reading material in French. Baker Dep. [Ex. 2] 253-254. That challenge did not tax plaintiff's engineering capabilities. Also, plaintiff testified that his job was not highly specialized and unique and that it could have been performed by any technician, including one with no more than a high school diploma, who had some experience in that field. See p. 7 above.

Defendant relies on *Leslie v. Ingalls Shipbuilding, Inc.*, 899 F.Supp. 1578 (S.D. Miss. 1995). Def. Mem. at 21-22. However, that case is easily distinguishable. In *Leslie*, the plaintiff "held positions of significant responsibility in the Engineering Department, including Overhaul Engineer, Lead Field Engineer and Project Engineer" (899 F.Supp. at 1579), all positions which were higher and much higher than plaintiffs; the "job description state[d] that the usual minimum qualifications [were] a "Bachelor's Degree in an engineering discipline and a minimum of ten (10) years experience or an advance degree and seven (7) years experience" (*id.* at 1582), while, of course, a bachelor's degree was not required here; "the plaintiff [in *Leslie*] performed work that was predominantly intellectual in nature and involved little, if any, manual labor or

mechanical work" (*id*.), while here the work was more manual than intellectual; and the

"Engineering Specialist at Ingalls must carry out specialized and novel engineering assignments

requiring the development of new and improved techniques and procedures, he must conduct

theoretical analyses and develop practical solutions to dynamic problems and control systems,

and he must conduct surveys or analyses of both technical and non-technical problems and

perform preliminary design feasibility studies" ( *id*.), while here plaintiff had no responsibilities

which approached those.  Also, in *Leslie* "well over 50%" of the plaintiff's responsibility was

"preparing structural specifications and standards, selecting major equipment items related to his

field, and writing engineering progress and other technical reports" (*id*.), none of which plaintiff

performed at ALSTOM, and in *Leslie* the plaintiff's performance evaluations stated he was "'an

extremely efficient and professional engineer' who handled large volumes of work 'with little or

no supervision'" (*id*.), while it is clear beyond any doubt that Mr. Baker, while working

independently much of the time, was supervised.

     Nor is defendant's defense supported by its citation of *Aneja v. Triborough Bridge and

Tunnel*, 35 Fed.Appx. 19, 8 Wage & Hour Cas.2d (BNA) 1408, (2nd Cir. 2002).  See Def. Mem.

at 22.  First, in accordance with the Second Circuit's Local Rule 0.23, the decision plainly states:

> **THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA.**

Second, as opposed to the situation here, the plaintiff apparently exercised discretion and

38

judgment regularly, and he could not identify a genuine issue of material fact, as plaintiff can here."[28]

Defendant then argues, "Mr. Baker is exempt under the FLSA because he consistently exercised discretion and independent judgment in his position as an Electrical Engineer." Def. Mem. at 22. This argument also lacks merit. In support of this argument, defendant contends, "Mr. Baker's admissions that he met this criteria further support the entry of summary judgment in favor of ALSTOM." *Id.*, referring to his performance self-evaluations, Def. Ex. G. However, as pointed out (Pl. Resp. ¶13 at 11-12), these self-evaluations were consistent with the record evidence that he was not already a supervisor, and there is no evidence that defendant considered them in classifying him as exempt two years earlier or even later. Defendant also alleges, "Mr. Baker conceded during ALSTOM'S Job Audit that he was primarily self directed with respect to his daily activities." Def. Mem. at 23, citing its Statement ¶15, Def. Ex. I. This allegation is false, as explained in Plaintiff's Response to Defendant's Statement of Relevant and Undisputed Facts. Plaintiff never saw the audit document prepared by Mr. Gomes. See Baker Dep. [Ex. 2 hereto] 189-90; Muscato Depo. [Ex. 5] 108. Therefore, he was not in a position to correct or confirm the statements in the audit document. Defendant should not be able to rely on a document which it created, which was not prepared by another of its 30(b)(6) witnesses, and which contains mischaracterizations of plaintiff's statements.

---

[28] The decision does not provide much more information about this *pro se* litigant.

39

### E.  The Violations Were Willful

The FLSA's standard statute of limitations is two years, but if the failure to pay overtime is "willful," the limitation period for overtime claims is three years.  29 C.F.R.§255(a). The three-year period applies if the employee can show the employer knew it was violating the FLSA or that it demonstrated reckless disregard for whether its conduct was prohibited by the FLSA.  *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Reich v. Monfort, Inc.*, 4 WH Cases2d 1106, 1334 (10th Cir. 1998) (willful violation shown when "audit disclosed violations that were the same as those cited in the present action."); *Cunningham*, 43 F. Supp. 2d at 977 (willful violation shown when employer either knew about FLSA violation or showed reckless disregard for conduct prohibited by statute.).  Here the violations were definitely willful, as shown below:

From the beginning of his employment as a direct hire, plaintiff repeatedly raised the issue about defendant's paying him overtime.  Tech/Aid paid him overtime for overtime work he performed for ALSTOM, and he asked his hiring managers whether he would receive overtime pay.  See pp. 4, 6 above.  After ALSTOM hired him, he repeatedly objected to working so much overtime and requested overtime pay.  See pp. 16-17 above.  He continuously recorded his overtime hours and reported it to his supervisor and other managers.  See pp. 13-17 above. Indeed, Jack Schroeder, Director of Commissioning and Warranty, was aware that Mr. Baker was working overtime.  Moses Dep. [Ex. 4] 126-27.  Between January and August 2001 defendant admittedly compensated overtime he worked.  Def's Response to RFA [Ex. 7] No. 16. While defendant may now call it a "mistake," its payment of overtime pay for eight months,

40

coupled with the termination of the overtime pay in August 2001, shows at least that defendant was conscious of an issue regarding whether to pay plaintiff overtime pay. Perhaps that is why defendant conducted its audit in late 2003.[29]

>Defendant asserts (Def. Mem. at 17 n. 21):

>Any argument by Mr. Baker that ALSTOM willfully violated the FLSA would be disingenuous given ALSTOM's demonstrated good faith through its *Job Audit*, reliance of Mr. Baker's representations and formation of a new compensation package.

However, this argument itself is disingenuous. The record shows that this audit, which defendant did not conduct until December 2003, late in plaintiff's back pay period, was seriously flawed. See p. 18 above; Pl. Resp., No. 15. Further, a comparison of the audit with the analysis above should illustrate convincingly that defendant's auditor, who was not produced in response to plaintiff's 30(b)(6) notices, neglected to consider numerous factors which would indicate that plaintiff was not exempt. Finally, there is no record evidence of any inquiry by ALSTOM to the Department of Labor or attorneys to determine whether employees such as plaintiff were actually exempt.[30]

>In any event, the facts on this issue are clearly not in dispute and are therefore not subject to summary judgment.

---

[29] As stated above, p. 17, Defendant explained the audit in e-mails throughout the company, but has not produced them in discovery. Nor has it produced any documents which showed an interpretation of the audit before defendant reclassified some employees.

[30] It should also be noted that defendant has refused to provide any evidence relevant to the question whether it sought help from an attorney or DOL on the exemption issue. See Pl. Motion to Compel, Mem. at 7.

41

### F.  Defendant's Motion is Barred by Rule 56(f)

For the foregoing reasons, the Court should deny defendant's motion for summary judgment.  There is another reason not to grant it.  As shown in Plaintiff's Motion to Compel and in the accompanying Rule 56(f) affidavit, defendant has failed or refused to produce considerable evidence and documents which would permit plaintiff to respond more completely to its summary judgment motion.  The information and documents which plaintiff has requested would provide valuable evidence about the following facts, which are essential to determining the outcome of this case:

- Details about defendant's hiring plaintiff as a direct employee.

- Details about all the duties of electrical engineers in Washington, D.C. during the period between January 1, 2001, and December 31, 2004.

- Copies of all advertisements for electrical engineer positions or any other positions which were substantially similar to plaintiff's, including advertisements for the exact position which plaintiff held.

- Copies of all job descriptions for plaintiff's position, all other electrical engineer positions in the Metropolitan Washington area, or any other positions in the Metropolitan Washington area which were substantially similar to plaintiff's.

- All supervision of plaintiff when he worked for defendant as an electrical engineer.

- All communications which defendant had with plaintiff about his status as exempt or non-exempt.

42

- All facts which could possibly permit defendant to classify plaintiff as exempt from overtime pay.

- All communications which defendant ever had with plaintiff about overtime pay before he filed this suit.

- Any overtime pay which defendant has paid any of its other electrical engineers anywhere in the United States, including without limitation their identity, their work sites, their position titles and the dates of such pay, and pay records for all electrical engineers employed by defendant in the Washington Metropolitan area since January 1, 2000.

- Any complaints or suits for overtime pay ever brought by or on behalf of any employees against defendant (whether in court or in any administrative agencies), and all decisions or opinions with respect to those complaints or suits, including all documents containing or relating to any complaints against defendant which were filed by or on behalf of its employees for alleged failure to pay them overtime after January 1, 1999, and the results of those complaints.

43

## V.  <u>CONCLUSION</u>

For the reasons stated above, plaintiff respectfully requests that the Court deny

defendant's Motion for Summary Judgment with prejudice.

Respectfully submitted,


_____/s/_____
ALAN BANOV #95059
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036
(202) 822-9699
Fax: (202) 842-9331
<u>Attorneys for Plaintiff</u>