**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KEVIN PATRICK BAKER,       )
                            )
            Plaintiff,      )
                            )
       v.               )  Case No. 05-CV-1352 (RCL)
                            )
ALSTOM TRANSPORTATION, INC.,  )
                            )
            Defendant.    )
_____)

PLAINTIFF'S RESPONSE TO
DEFENDANT'S STATEMENT OF RELEVANT AND UNDISPUTED FACTS

Pursuant to LCvR 56.1 and LCvR 7(h), Plaintiff Kevin Patrick Baker, through his undersigned counsel, responds as follows to defendant's "Statement of Relevant and Undisputed Facts," Def. Memo, pp 4-14.[1]

Defendant proclaims that its statement was "derived from Plaintiff's *Complaint*, his discovery responses and deposition testimony, the deposition testimony of Defendants' representatives, and documents which were identified in those depositions and/or provided to Plaintiff during discovery" and that it "accepts the facts alleged by Plaintiff as true only for purposes of this *Motion*" (*id.* at 4. n. 4). However, defendant obviously does not accept all of the allegations of plaintiff's complaint, <u>all</u> of his interrogatory answers, or <u>all</u> of his deposition testimony, and a party cannot accept such facts "as true only for purposes of [a summary judgment] motion." Defendant is confusing a summary judgment motion with a 12(b)(6) motion.

---

[1] Some of defendant's statements of undisputed fact do not refer to any parts of the record, such as interrogatory answers or depositions. That deviates from LCvR 7(h) and 56.1 (which provide that the statement "shall include references to the parts of the record relied on to support the statement").

1.  Plaintiff does not dispute any of the facts stated in this paragraph.

2.  Plaintiff does not know whether "ALSTOM is a recognized leader in the rail car and signaling industry," particularly in light of the testimony that its locomotive and equipment kept breaking down (Baker Dep. [Ex. 2] 216; Exs. 14-15), but plaintiff does not dispute this irrelevant paragraph.

3.  Defendant's statement about this "standard requirement for the Electrical Engineer position" for which it hired plaintiff is not supported by the exhibits it cites or by the record in general.  It is disputed that the referenced job posting (Def. Ex. B) was not for plaintiff's position.  See Baker Dep. [Ex. 2] 143-148; Moses Dep. [Ex. 4] 47.  Also, there is no evidence that ALSTOM "instructed applicants that the Electrical Engineer position required a bachelor's or higher degree in Electrical, Electronic, or other appropriate engineering field," as defendant contends, Def. Mem. at 5, citing Muscato Dep. [Ex. 5] 50, 51.  Cf. Baker Dep. [Ex. 2] 122-123, 126; Moses Dep. [Ex. 4] 34-35, 89.  Indeed, when Curtis Moses requested an engineer for the position which plaintiff ultimately filled, he did not say that he needed someone with any kind of special degrees; he just indicated that he needed someone with at least five years of experience.  Moses Dep. [Ex. 4] 52.  Also, whenever he would request a new engineer, Mr. Moses would ask for a high school graduate with some type of electrical degree --associates or bachelor's.  Moses Dep. [Ex. 4] 102.  Further, defendant grossly mischaracterized Mr. Muscato's testimony.  He admittedly had nothing to do with recruiting or classifying plaintiff, since he came to the company two years later (Muscato Dep. [Ex. 5] 9), and he did not testify that "the Electrical Engineer position required a bachelor's or higher degree in Electrical,

Electronic, or other appropriate engineering field."[2]  Rather, Mr. Muscato testified that a

bachelor's degree was "preferred" for electrical engineer positions and that he "[had] not seen a

position description [for the position] that said bachelor's."  Muscato Dep. [Ex. 5] 44-45.  See

also Muscato Dep. [Ex. 5] 59.

    4.  It is true that "Mr. Baker completed an *Employment Application* for the position of

Electrical Engineer with ALSTOM."  He completed the application after defendant had already

offered him the subject position and he had accepted it.  See Baker Dep. [Ex. 2] 129, 135.

However, it is absolutely false, and not an undisputed fact, that "[t]herein, Mr. Baker

represented, *under oath*, that he possessed a bachelor's degree in Electrical Engineering from

SUNY Binghamton," as defendant contends (Def. Mem. at 5).  On the contrary, plaintiff testified

that he earned about 110 credit hours at SUNY Binghamton, but did not complete all of the

course requirements for a bachelor's degree (Baker Dep. [Ex. 2] 60-61); that in the application

process, plaintiff represented that he had associate's degrees, but not a bachelor's degree (Baker

Dep. [Ex. 2] 100-101, 121-122); that he did not recall stating in the application that he had a

bachelor's degree (*id*. at 130-132); and that "BSEE" on the application did not look like his

handwriting (*id.* at 132-33).  Rather, he testified (*id.* at 131-33):

> My specific recollection of filling out this application was leaving that blank.  In
> reference to leaving it blank, I would refer to my previous conversation with Matt Rivera
> on whether or not I had intended on completing.  But I had not at that time, so I should --

---

[2]    Defendant asserts:  "Mr. Baker conceded that he had seen this document before (*Baker Dep. [Ex. 2] Tr.*, at 148, **Exhibit A**), and that it was similar to the one that he viewed on ALSTOM's web site when he was applying for the ALSTOM Electrical Engineer position (*Baker Dep. [Ex. 2] Tr.*, at 146 – 148, **Exhibit A**)."  Def. Mem. at 5 n. 5.  That misstates Mr. Baker's testimony, for he testified that he did not know if he had seen it before, Baker Dep. [Ex. 2] 144, and that he may have seen similar documents on ALSTOM's intranet, Baker Dep. [Ex. 2] 146-148.  Also, in answering defendant's question about whether he recalled seeing the requirement of  "bachelor's degree or higher in electrical, electronic or other appropriate engineering fields" for the job of electrical engineer, plaintiff testified, "Some of them, yes, and some of them, no."  Baker Dep. [Ex. 2] 148.

I recall that as when I was filling this out, I would have to represent myself as having not completed it because that's how I had verbally, so I don't recall checking, yes, here.

I do recall putting the course or major. I do recall. And I put three years, but that really probably should have been four, if you want to count calendar years. But I had taken a semester here or there off, so three years was kind of an okay answer for that, but --

Q.   Next to the block under completed with the yes or no check marks, there's the term, degree. And it has letters for Onondaga Community College, it represents, ASES, otherwise, I'm going to understand your associate's degree. Next to SUNY Binghamton, it has the letters, BSEE. Can you recall or based on your review of this document; is that your handwriting?

A.   Well, the -- it doesn't really look like my writing because that's -- I make my E's different than that. But I don't -- my recollection of filling this out is not -- looks a little bit like my writing, but it's not normally how I make my E's. That all I can say.

I do recall actually putting engineering science in there and stuff like that, but -- and, you know, Onondaga Community College. And I remember, you know, there wasn't really enough room to write everything, but --

Q.   So it's your testimony you don't recall whether or not you actually made the designation, BSEE, in conjunction with the representations about your attendance at SUNY Binghamton?

MR. BANOV:  As it states.  Testimony is correct, but please restate your testimony.

THE WITNESS:  Excuse me?

MR. BANOV:  Please restate your testimony.

THE WITNESS:  I don't recall exactly what I put there, if anything. All I'm stating is that that doesn't look like my handwriting, which was specifically what you had asked me.

5.   It is true that in October 2000, ALSTOM formally "offered Mr. Baker a full-time position with the company as an overtime exempt Electrical Engineer in its Washington, D.C. job site"; that the offer letter "expressly informed Mr. Baker that the position of Electrical Engineer 'would be exempt from overtime' and that he would be paid $55,000.00 per year on a salary basis"; and that plaintiff signed the letter. Earlier, however, when Operations Manager Matt Rivera offered plaintiff the job at an interview, he told plaintiff that, even though he was a manager and salaried, he himself was often paid overtime. Complaint ¶12; Baker Dep. [Ex. 2]

119-120, 123-127.  Other exempt employees were paid overtime, too.  See Ex. 16.

6.  It is true, as defendant states (Mem. at 6), that "prior to accepting a position with ALSTOM as an overtime exempt Electrical Engineer, Mr. Baker possessed extensive experience in the field of engineering and electronics" and that plaintiff worked in the jobs which defendant lists.[3]  However, it is also undisputed that in all of plaintiff's positions before he worked for ALSTOM, he was an hourly, non-exempt employee and that in virtually all plaintiff's prior positions, he served as an electronics technician or in an equivalent position, assisting electrical or electronics engineers.  Baker Dep. [Ex. 2] 47, 50, 51, 53, 63, 64, 68.

7.  There is no dispute that plaintiff attended the identified academic institutions "for the purpose of furthering his studies in engineering" and electronics.[4]  However, it is a value judgment to say that, in doing so, Mr. Baker "engaged in extensive specialized intellectual instruction and study."  Plaintiff testified that he "took classes [at Tidewater Community College] on and off for a number of years" (Baker Dep. [Ex. 2] 45); that he attended Onondaga Community College after being laid off from a job (Baker Dep. [Ex. 2] 55-56); and that he attended SUNY Binghamton "for one semester full time and . . . the following semester half time" and then, on and off for an additional four years, taking a course here and a course there,

---

[3]  It might be noted that defendant derived its list from Plaintiff's Answers to Defendant's First Set of Interrogatories to Plaintiff, but does not introduce the discovery response itself as an exhibit.  Plaintiff does, as Exhibit 1.

[4]  Defendant asserts, "Mr. Baker has failed to produce his complete academic transcripts despite repeated requests for the same during the course of discovery."  Def. Mem. at 7 n. 7.  However, as explained in the accompanying memorandum, it is not the applicant's credentials which make a position exempt or non-exempt; it is what the employer requires of the hired employee and assigns the employee to do.  Nonetheless, plaintiff has requested transcripts from the five academic institutions he attended, and to date, three have responded.  Plaintiff's counsel has forwarded copies of these transcripts to defendant.

part time" (Baker Dep. [Ex. 2] 60).[5]

8.  It is true that "[a]s an ALSTOM Electrical Engineer, Mr. Baker was required to use certain . . . tools as a part of his job, such as an oscilloscope, digital volt meter, HI-POT, chart recorder and a capacitance meter," as defendant states (Def. Mem. at 8).  However, defendant cites no evidence that these are "highly technical tools," as defendant also asserts (*id*.).  By contrast, Mr. Moses testified that one would not need a college degree to operate an oscilloscope, HI-POT, chart recorder, or capacitance meter and that one could learn to operate them in freshman college courses.  Moses Dep. [Ex. 4] 36-37.  Moreover, it is undisputed that, in the subject job, plaintiff was also required to use hand tools, such as screwdrivers and wrenches.  Baker Dep. [Ex. 2] 242; Moses Dep. [Ex. 4] 38-39; Muscato Dep. [Ex. 5] 76, 86.[6]

9.  It is true that "Mr. Baker was responsible on a daily basis for troubleshooting and providing technical maintenance of ALSTOM's high-speed trains, specifically its AMTRAK operations," as defendant states (Mem. at 8).  However, that does not mean that plaintiff operated with complete autonomy or without supervision or guidance.  Work in the D.C. operations was initiated by work orders from customers, such as AMTRAK.  Moses Dep. [Ex. 4]  85-86.  After receiving directions from his superiors, Mr. Moses made the assignments by daily reports, which he e-mailed not only to plaintiff, but also to "mass distribution lists" of ALSTOM personnel in

---

[5]  Defendant questions plaintiff's credibility by stating that plaintiff committed "resume fraud."  Def. Mem. at 7 n. 8.  Defendant's accusation is disingenuous because it ignores plaintiff's testimony that he represented to Matt Rivera during his interview and to Louis Gomes during an interview for an audit that he was a few credits short of receiving his bachelor's degree.  Baker Dep. [Ex. 2] 126, 194-196.  Defendant also ignores plaintiff's testimony that it is not his handwriting of "BSEE" on the *Employment Application*.  Baker Dep. [Ex. 2] 132-133.

[6]  Mr. Moses estimated that about twenty percent of plaintiff's daily work involved using hand tools, to open and close access panels in locomotives.  Moses Dep. [Ex. 4] 38-39.  Plaintiff does not accept that estimate as a fact, since he could not quantify how much of the job was intellectual, as opposed to mechanical or physical, Baker Dep. [Ex. 2] 241, but cites it to show that at least 20% of his work required hand tools.  In his affidavit (attached) plaintiff breaks down the positions of his time on each major function.

the U.S., as well as in France. Moses Dep. [Ex. 4] 59, 60, 65-66, 71-74. The reports indicated what equipment had what problem, who specifically had been working to solve the problem (e.g., plaintiff), who would be working on it, and where the work would be conducted. Moses Dep. [Ex. 4] 71-74. For the most part, Mr. Moses prioritized plaintiff's tasks and assigned him work on a daily basis. Baker Dep. [Ex. 2] 239; Moses Dep. [Ex. 4] 58-59. Sometimes other managers initiated the work. See e.g., Ex. 3 ¶¶8, 9; Exs. 14, 15.

Defendant cites no record references for its next statement, "A substantial part of Mr. Baker's duties consisted of investigating technical faults and anomalies" (Def. Mem. at 8), and indeed there is no evidence in the record to support it. Plaintiff objects to the vague term, "substantial." Certainly some of plaintiff's duties included failure analysis and troubleshooting, but it also entailed many menial and physical tasks, as he performed many tasks of manual labor. Baker Dep. [Ex. 2] 165-166, 241. Moreover, as the job evolved, there were times when all he would do was go into a train, remove components which needed modification, and install new components. Baker Dep. [Ex. 2] 242. This removal and installation could be 80% of the time; sometimes it could be only 20% of the job. Baker Dep. [Ex. 2] 242-43. On average, about 50% was doing paperwork, writing e-mails, and filing reports. Baker Dep. [Ex. 2] 243.[7] As plaintiff also testified, it was work that any "lowly trained technician" could do. Baker Dep. [Ex. 2] 242. In his affidavit [Ex. 3], plaintiff explains:

> 3. I can generally categorize my responsibilities at ALSTOM as 1) fixing faults, 2) fixing anomalies, and 3) performing modifications to equipment (commonly known as the repairing and removing of parts with improved ones). I spent the following percentages of my work time to each general responsibility: faults, 20%; anomalies, 20%; and modifications, 60%.

---

[7] The paraphrased testimony (Baker Dep. [Ex. 2] 242-43) was plaintiff's only testimony about the percentages of his time in physical labor, as opposed to other work. Defendant did not ask him what part of his duties "consisted of investigating technical faults and anomalies" (Def. Mem. at 8). Nor is there any record evidence on that subject. However, plaintiff has addressed these percentages in his Affidavit, Ex. 3.

Also, defendant <u>exaggerates</u> how much more expertise was necessary to fix an anomaly. Thus, Mr. Moses, whom defendant purports to quote, merely stated (Moses Dep. [Ex. 4] 78): "The anomaly would now require someone with a little bit more, or a little bit more stronger electrical or electronic expertise to troubleshoot the equipment." He also stated that the work of fixing anomalies was usually assigned to engineers, but on rare occasions technicians would also fix them. Moses Dep. [Ex. 4] 78.[8] Plaintiff's only reference to anomalies in his deposition was the following (Baker Dep. [Ex. 2] 35):

> To the layman, you know, you'd probably -- might take quite a while for you to understand. But in a nutshell you analyze or evaluate a reported electronic failure, determine if the electronic failure is -- actually exists or it was an anomaly. If there is a failure, then you diagnose the cause and repair it. You find the failed component, whether it be a large black box or a small resistor or transistor depending on the various different needs at the time.

Because defendant did not address the issue in plaintiff's deposition, he did so in the attached affidavit (Ex. 3). There he pointed out that fixing faults or anomalies did not require advanced knowledge. Ex. 3, ¶5. Fixing an anomaly could be as simple as rebooting a computer. Most often he had no significant involvement in diagnosing anomalies because a solution required the expertise of an engineer from headquarters or the vendor. *Id*. Also, plaintiff had no involvement in diagnosing the anomaly or determining how to resolve the situation (which happened to be a design issue). Engineers at other locations, such as at Hornell, NY, or in France, most likely diagnosed the issue and drafted the instruction. Ex. 3 ¶10.

More importantly, while it may be true that "Electrical Engineers, such as Mr. Baker, exercised a greater degree of independent judgment than a regular technician" (Def. Mem. at 8),

---

[8] Defendant asserts: "Mr. Baker conceded that it was 'rare' for a technician in his field to occupy their position with only a high school education." Mem. at 8 n. 13, citing Baker Dep. [Ex. 2] 229. However, plaintiff <u>actually</u> testified: "All technicians require some training, some of them do it on the job. I've met a few that had no more than a high school education. There are. That's rare." Baker Dep. [Ex. 2] 229. He also testified that "any other technician in the country would have gotten [the job] had they had a good deal of experience like myself." *Id.*

there are disputed facts about the extent to which <u>plaintiff</u> exercised independent judgment.

Thus, in answering defendant's question, "Fully identify how you exercised independent

judgment and/or decisions in your position as an ALSTOM electrical engineer," plaintiff stated

in his interrogatory answers (Pl. Int. Ans. [Ex. 1], No. 23, p. 25):

> I prioritized my work and decided which route would help me best accomplish my tasks, but my supervisor oversaw my work and made the critical decisions involving independent judgment that supervisors are well within their authority to make.

Also, plaintiff had to consult manuals for determining and fixing faults, and Mr. Moses and

others might give plaintiff advice about how to solve anomalies.  Moses Dep. [Ex. 4] 116-18.

See also Ex. 3 ¶16.

Defendant contends, "repairing anomalies also required the use of a lap top computer

which contained specialized software."  Def. Mem. 8-9, citing Moses Dep. [Ex. 4] 79-80.  That

is true, but defendant makes too much of this fact.  As Mr. Moses also testified (Moses Dep. [Ex.

4] 79-80) and as defendant acknowledges, it conducted training on the software, rather than

expecting employees to learn it before they were hired.

Defendant misstates plaintiff's testimony about the intellectual challenges of his position

(Def. Mem. 9 n. 14 citing Baker Dep. [Ex. 2] 253-254).  Plaintiff testified that "the most

difficult" challenge of his job, aside from the "long hours and some of the manual labor that was

involved," was reading material in French.  *Id*.  The "engineering" issues were thus minor in

comparison.

10.  It is <u>not</u> true that "Mr. Baker was responsible for supervising between one to four

technicians who were assigned to the job site," as defendant argues (Def. Mem. at 9).  This is

<u>another</u> gross exaggeration.  Actually, plaintiff supervised no one.  Baker Dep. [Ex. 2] 203.

While he may have informed technicians on other shifts about where he left off on his work, see

Moses Dep. [Ex. 4] 82-88, plaintiff did not have the authority to evaluate any technicians, to

recommend raises or bonuses for technicians, or to hire or fire technicians.  Moses Dep. [Ex. 4] 92-94.  All he did with respect to the technicians was to advise them, by e-mail, before leaving the job site, when he left off in conducting repairs and how they could complete the job.  See Moses Dep. [Ex. 4] 82-88.  Similarly, defendant overstates Mr. Moses' testimony on plaintiff's input on recommending promotions for technicians, for Mr. Moses merely testified that plaintiff had just "minimum input," on inquiry from Mr. Moses, on promoting any technicians whom Mr. Moses supervised.  Moses Dep. [Ex. 4] 92-94.[9]

11.  Besides the fact that this statement ("Mr. Baker worked independently on a daily basis.") is not supported by defendant's deposition reference (Moses Dep. [Ex. 4] 97), defendant again misrepresents the record.  See above, pp. 7-8; Pl. Opp., Mem. at 9-11.  Plaintiff was somewhat self-directed, but he did not operate without supervision.  Baker Dep. [Ex. 2] 203, 239.  Defendant also asserts that plaintiff testified that "his experience and training was [*sic*] greater than Mr. Moses's."  Def. Mem. at 9 n. 15, citing Baker Dep. 175.  However, defendant again mischaracterizes the record on an irrelevant point.  Actually plaintiff testified as follows, in response to a provocative question from defendant:

> Q.  You had described for me earlier in the day your prior experiences and training and the sort, and I was wondering if Curtis Moses, his experience and training and background was greater than yours to the extent that he was offered a -- what some would characterize as a superior position, when he started full time for Alstom?
>
> A.  The short answer is no and the long answer is he was usually vague or contradictory when describing his previous experience.  So I can't answer what his qualifications were or his experience or education level.  And I have absolutely no idea what he had conveyed to management when he was hired.  I was completely separate from that.  *So I don't have any knowledge, I guess would be the better answer*.  Baker Dep. [Ex. 2] 175 (emphasis added).

---

[9] Mr. Moses added (Moses Dep. [Ex. 4] 92):
> Kevin would be required at different times, depending on the task, to assess the repair, to ensure that the repair was made correctly, timely manner and safely.
> So, based upon all those assessments, I would make my determination of the technical aspect of an employee.

12.  This is <u>another</u> example of defendant's distortion of the record.  Actually, rather than expressing desire to assume <u>increased</u> responsibility supervising the employees, plaintiff expressed his desire to <u>become</u> a supervisor.  See Moses Dep. [Ex. 4] 96-98, 179-80; Def. Ex. I.  Also, the record is clear that during the period covered by his complaint, plaintiff did not serve as a supervisor as defined by the FLSA and DOL regulations.  See Baker Dep. [Ex. 2] 203; Pl. Mem. at 10-12.  Further, Mr. Moses did not tell Mr. Baker that "he <u>would</u> receive training and personal mentoring in order to assume those additional responsibilities" (emphasis added); he said it would be "possible" for plaintiff to become a supervisor, "with training."  See Moses Dep. [Ex. 4] 96.

13.  Plaintiff does not deny that his "job performance was measured through periodic self evaluations and feedback from his direct manager, Curtis Moses," and that in his 2002 and 2003 self-evaluations, he expressed the objectives which defendant cites.  Defendant correctly quotes plaintiff's boasting about his qualifications (Def. Ex. G), but that puffing had no impact on defendant's classifying him as exempt two years earlier or even later.  Plaintiff's aspiration "to become a Project Leader" (Def. Ex. G) is consistent with the record evidence that he was not already a supervisor.  Similarly, on his 2003 self-evaluation (Def. Ex. H, at ALS0365), plaintiff expressed his objective to "<u>become</u> a better team player but with minimal supervision" (emphasis added), and on the same page Mr. Moses refers to plaintiff as "lead tech," not lead <u>engineer</u>.

14.  Mr. Moses did testify that defendant assigned plaintiff the "day-to-day activities, troubleshooting, interfacing with the customer, engineering investigation, technical analysis and reporting back to [ALSTOM's operating location in France] on a weekly basis."  Moses Dep. [Ex. 4] 161.  However, no document confirms this assignment.  Moses Dep. [Ex. 4] 161.  Also,

while Mr. Moses did testify that plaintiff supervised the efforts of various technicians employed

by the Maryland Department of Transportation, a customer (Moses Dep. [Ex. 4] 163), Mr. Moses

also testified that plaintiff could not hire the MDDOT employees, fire them, evaluate them, or

grant them overtime.  Moses Dep. [Ex. 4] 163-164.  Accordingly, plaintiff did not really

"supervise" employees of another employer.[10]  Further, even after he became the project lead,

plaintiff still supervised no ALSTOM employees, and Mr. Moses remained the customer's first

point of contact, directed the work, coached plaintiff, and evaluated plaintiff, while Mr. Amar

managed the warranty aspect and controlled company assets.  Complaint ¶27; Pl. Int. Ans., p. 8;

Moses Dep. [Ex. 4] 164-65.

15.  In explaining its audit, defendant is generally correct.  However, in describing what

plaintiff stated to Louis Gomes (Def. Mem at 12), defendant neglects to point out that plaintiff

did not see the audit document until this litigation (Baker Dep. [Ex. 2] 190) and it does not

distinguish between what Mr. Gomes wrote and what plaintiff recalls telling him.[11]  Further,

plaintiff testified that the information on the audit document does not reflect what he recalls of

the conversation.  Specifically, the document contained mischaracterizations of plaintiff's

statements, including that plaintiff had a bachelor's degree (Baker Dep. [Ex. 2] 194-196) and that

he alone prioritized his work (Baker Dep. [Ex. 2] 200-201).

---

[10]  Defendant also contends that Mr. Baker admitted that new employees were instructed to
"follow him around" to contend benefit from his experience and training.  Def. Mem. at 11 n. 16,
citing Baker Dep. [Ex. 2] 204.  This is yet another exaggeration by defendant.  Actually plaintiff
testified, "[O]ccasionally new employees would come and they'd say [']follow him around and
see what he does,['] but I wasn't supervising them."  Baker Dep. [Ex. 2] 204.

[11]  One of plaintiff's 30(b)(6) notices asked defendant to produce "the official or representative
of Defendant ALSTOM Transportation, Inc. who knows the most about the qualifications for
plaintiff's position, plaintiff's exempt/non-exempt classification(s), and any audits of his
position."  Defendant did not produce Mr. Gomes as its 30(b)(6) witness on these points, but
offered Gregory Muscato instead.  See Muscato Dep. [Ex. 5] 11.  However, as mentioned in the
accompanying memorandum, Mr. Muscato could not explain why defendant had classified
plaintiff as non-exempt because he joined ALSTOM several years later (in May 2002), and no
document explains that classification decision.  Muscato Dep. [Ex. 5] 9, 36, 40, 55, 72.

16. There is no dispute about the facts in this paragraph, except for defendant's gratuitous and erroneous <u>legal</u> argument, "While Mr. Baker was not eligible for overtime compensation." Def. Mem. at 13.

17. The "facts" stated in this paragraph are mere opinions by Mr. Moses and may relate to plaintiff's rights under the Family and Medical Leave Act, not the FLSA. Thus, the FMLA recognizes the concept of a "key" employee.

18. It may be true that in 2004, "ALSTOM instituted a new compensation program," as defendant states (Def. Mem. at 13), but it is not necessarily true that, as a result of it, "Mr. Baker's Electrical Engineer position was re-titled as a Test Engineer Specialist," as defendant states (Def. Mem. at 13), referring to Ex. K. Indeed, Mr. Moses did not recognize the referenced position description and even declared that plaintiff was not performing the tasks in the position description! See Moses Dep. [Ex. 4] 104-05. Mr. Moses also called plaintiff a "lead tech." Def. Ex. H. See above, p. 11. Accordingly, there is no merit to defendant's contention that plaintiff was performing the tasks of a Test Engineer Specialist, as those tasks are quoted on page 13.

Defendant also asserts, "A Test Engineering Specialist was equivalent to an Electrical Engineer." Def. Mem. at 13 n. 20, referring to Muscato Dep. [Ex. 5] 49; Exhibit C . However, Mr. Muscato testified, vaguely, "From my understanding, that was the same as the electrical engineers and that was a grade H" (Muscato Dep. [Ex. 5] 40), and when plaintiff worked for a prior employer (Lockheed Martin), he was promoted from "electronics technician" to "test engineering specialist," without becoming an engineer or exempt employee. See Baker Dep. [Ex. 2] 68-70. Accordingly, as far as <u>this</u> record shows, the term, "Test Engineer Specialist" did not necessarily connote an exempt engineering position in the industry.

Respectfully submitted,


_____/s/_____
ALAN BANOV #95059
Alan Banov & Associates
1819 L Street, N.W., Suite 700
Washington, D.C. 20036
(202) 822-9699
Fax: (202) 842-9331
<u>Attorneys for Plaintiff</u>