# EXHIBIT B

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3       - - - - - - - - - - - - - X

4    KEVIN PATRICK BAKER,        :

5          Plaintiff,             :

6          Vs.                    :    Case No.: 05-CV-1352

7    ALSTOM TRANSPORTATION,       :

8    INC.,                        :

9          Defendant.             :

10      - - - - - - - - - - - - - X

11

12              Monday, November 7, 2005

13                   Washington, D.C.

14   Deposition of:

15              CURTIS MOSES,

16   the Witness, called for examination by counsel

17   for the Plaintiff, pursuant to notice, commencing

18   at 9:45 a.m., at the law offices of Alan Banov &

19   Associates, 1819 L Street, N.W., Washington,

20   D.C., before Curtis R. Cloward, CSR, a Notary

21   Public in and for the District of Columbia, when

22   were present on behalf of the respective parties:

```
1    all the daily reports with Kevin Baker's name in
2    it.
3              BY MR. BANOV:
4         Q.    Did the E-mails identify technicians
5    who were working on these trains and train sets
6    and the locomotives?
7         A.    All personnel.
8         Q.    Okay.
9              And those E-mails were broadcast
10   throughout ALSTOM in the USA and over in France?
11        A.    Yes.
12        Q.    Did Kevin Baker ever come to you and
13   say I want to work on Locomotive 3 today?
14        A.    Repeat the question.
15        Q.    Did Kevin Baker ever come up to you
16   and say Curtis, I want to work on Locomotive No.
17   3 today?
18              In other words, did he initiate work
19   on a locomotive without --
20        A.    Yes.
21        Q.    Yeah?
22        A.    Yes.
```

1     A.    Yes.

2     Q.    And they have given this cook book for
3  people in the States to use?

4     A.    Yes.

5     Q.    And if it's an anomaly, give me an
6  idea about how an electrician, electrical
7  engineer here would try to fix that anomaly.

8     A.    The anomaly would now require someone
9  with a little bit more, or a little bit more
10 stronger electrical or electronic expertise to
11 troubleshoot the equipment.

12           It may require instrumentation of the
13 vehicle, diagnostic software, the use of also a
14 laptop as well.  That was the interface.

15    Q.    Would technicians do that work in
16 diagnosing an anomaly?

17    A.    Rarely.

18    Q.    Would they usually be done by the
19 electrical engineer?

20    A.    Yes.

21    Q.    And whoever does it would have a
22 laptop that they would hook up to the --

```
 1   take for him to explain the new software?
 2        A.   Within a day or two, just on the
 3   software end.
 4        Q.   Did Kevin ever write any daily reports
 5   out of Washington?
 6        A.   Yes.
 7        Q.   And on what occasion would Kevin write
 8   daily reports?
 9        A.   Daily, during his shift.
10        Q.   Were all electrical engineers assigned
11   the duty of writing daily reports on what they
12   did?
13        A.   Yes.
14        Q.   And did technicians also do daily
15   reports?
16        A.   Yes.
17        Q.   Did you assign Kevin that task of
18   doing daily reports?
19        A.   Yes.
20        Q.   Around how much contact did you have
21   with Kevin on a daily basis?
22        A.   I would say ten percent of my day.
```

```
 1      A.    Yes, um-hum.
 2      Q.    Did you offer to mentor Kevin so he
 3   could be a supervisor?
 4      A.    Repeat the question.
 5      Q.    Okay, did you offer to mentor Kevin so
 6   he could become a supervisor?
 7      A.    Yes.
 8      Q.    And do you recall when you made that
 9   offer?
10      A.    2004.
11      Q.    Do you recall when that was, what
12   month approximately?
13      A.    Probably the beginning of 2004,
14   probably January, somewhere around there.
15      Q.    Isn't it true that Kevin mostly worked
16   alone?
17      A.    Yes.
18      Q.    Do you recall any situations where any
19   technicians worked with Kevin when he was working
20   for ALSTOM?
21      A.    Yes.
22      Q.    And do you recall how often that
```

Page 121

1  Q. Okay, did you ever question him about
2  his hours?
3  A. Yes.
4  Q. Give me an example of when you did.
5  A. I would question certain charge codes,
6  make sure that they was associated to a correct
7  repair.
8  Q. Does that charge code on this 222,
9  right, the first page of this exhibit?
10 A. Yes.
11 Q. And that's 16082092?
12 A. That's correct.
13 Q. That's what you're referring to by as
14 the charge code?
15 A. Yes, um-hum.
16 Q. Do you know what that charge code is
17 for?
18 A. NEC project.
19 Q. So, did that indicate that all the
20 time he worked that week was on that charge code?
21 A. Yes.
22 Q. When I said "week" I made a mistake.

```
 1   for doing that work?
 2        A.    Yes.
 3        Q.    Did you tell him that the company
 4   would give him overtime pay?
 5        A.    No.
 6        Q.    What did you tell him as far as extra
 7   compensation?
 8        A.    Time, comp time.
 9        Q.    Comp time.
10              Did you give him comp time for working
11   the extra time?
12        A.    Yes.
13        Q.    Did he use the comp time?
14        A.    Yes.
15        Q.    Okay.
16              Now, back to the Maryland Department
17   of Transportation technicians.  Isn't it true
18   that all Kevin really did was to train them?
19        A.    If you can rephrase the question?
20        Q.    Well, didn't Kevin train those
21   technicians to maintain the equipment?
22        A.    Yes.
```

1    Q.    Okay, but he didn't actually give
2  these technicians orders, did he?
3    A.    Yes.
4    Q.    He did?
5          Were there objections by these
6  Maryland employees to a private-sector employee
7  ordering them around?
8          MR. DUKE:  Objection.
9          THE WITNESS:  No, there was no
10  objection.
11         BY MR. BANOV:
12    Q.    Had this been done before?  Had ALSTOM
13  employees ever supervised Maryland employees?
14         MR. DUKE:  Objection, relevance.
15         THE WITNESS:  No.  New project, new
16  technology.
17         BY MR. BANOV:
18    Q.    Was there an audit that was conducted
19  of ALSTOM's field services positions?
20    A.    Yes.
21    Q.    And when was that?
22    A.    2003, if my memory serves me well.

Page 182

1   possibly support Kevin's claims for overtime in
2   this case?
3       A.   No.
4            MR. BANOV:  What we're doing here,
5   just for the benefit of Mr. Duke, we'll be giving
6   to you shortly a CD containing documents you've
7   asked for.  And there's one document that is
8   supposed to have an E-mail from Mr. Moses and
9   about outsourcing.  And I want to see if it's
10  important enough to enter as an exhibit here.
11           I have no more questions.
12           MR. DUKE:  Okay, you've just responded
13  to questions from Mr. Banov, Mr. Baker's counsel.
14  I now have the opportunity to ask you questions
15  in follow-up to the questions that you've already
16  testified to this morning.
17           THE WITNESS:  Okay.
18           MR. DUKE:  I'll try not to take up a
19  tremendous amount of time, but I have some
20  questions in follow-up to your earlier testimony.
21       EXAMINATION ON BEHALF OF THE DEFENDANT
22           BY MR. DUKE:

Page 184

1  able to give a more difficult task to.

2      Q.   The general difference between the
3  level of independence exercised by a technician
4  versus an electrical engineer, in your
5  estimation?

6      A.   Repeat the question.

7      Q.   The difference, the qualitative
8  difference, in the amount of independent judgment
9  exercised by a technician versus an electrical
10 engineer?

11     A.   Technician would pretty much would
12 have to use his judgment based upon a manual, a
13 troubleshooting manual.  And have to rely upon
14 another more experienced personnel to give them
15 guide-ship or some type of leadership doing
16 troubleshooting.

17          Engineer, would have more independent
18 thought -- thought -- and basically training to
19 make snap judgments on releasing the train for
20 revenue service.

21     Q.   And before you had testified about the
22 difference between anomalies versus faults.

Page 188

```
 1   performance evaluations, recommend to employees
 2   to further their educational pursuits if you felt
 3   that was necessary for them to attain the status
 4   that they desired?
 5        A.   Yes.
 6        Q.   And if an individual needed to further
 7   their educational background, would that have
 8   been a comment that you would have made during
 9   the course of their performance evaluation?
10             MR. BANOV:  Objection, hypothetical.
11             THE WITNESS:  Yes.
12             BY MR. DUKE:
13        Q.   Before, you testified that Mr. Baker
14   had the opportunity to supervise certain Maryland
15   Department of Transportation employees.
16             Do you recall that testimony?
17        A.   Yes.
18        Q.   Can you state in which specific ways
19   he may have supervised those individuals?
20        A.   He would have given them technical
21   instructions of certain troubleshooting tasks to
22   perform.
```

Page 189

1    Q.    Was there anything else that you can
2    recall?
3    A.    No, that's pretty much it.
4    Q.    Earlier, you testified regarding
5    Exhibit No. 4, which is captioned as a job
6    posting.  I'll let you look through mine.
7          After having had an opportunity to
8    review this document, were the, say, the captions
9    of experience and skills, education and training,
10   would that have been consistent with the
11   experience and skills, education and training of
12   an electrical engineer, to the best of your
13   knowledge?
14   A.    For an electrical engineer, yes.
15   Q.    Did Mr. Baker, in your observation of
16   him as his direct supervisor, exercise
17   independent judgment?
18   A.    Yes.
19   Q.    And in what ways would he have done
20   so?
21   A.    He would basically be given a very
22   broad knowledge of the particular fault or an

1   anomaly on a locomotive.  And from there he would
2   diagnose the problem with the train on his own.
3       Q.    There was a notation in one of the
4   documents regarding punctuality.  I believe it
5   was in -- I'll direct you specifically to Exhibit
6   13, ALS  367.  You can look over my shoulders.
7       A.    Yes.
8       Q.    There is a reference in the very
9   bottom -- I presume that to be in your
10  handwriting -- captioned as punctuality, "needs
11  much improvement."
12      A.    Yes.
13      Q.    Were there instances in which you
14  afforded Mr. Baker certain accommodations
15  regarding when he came in to work or when he was
16  allowed to, for instance, leave work during the
17  course of a business day?
18      A.    Yes.
19      Q.    And what were those circumstances?
20      A.    Kevin had had child care issues,
21  whether it was in the morning or in the evening,
22  and I would immediately grant him the time off

Page 191

1   that he needed.
2       Q.    If you can describe to me the effect
3   on Mr. Baker's job and his position when the,
4   what we've decided to term as the "ex-pats," the
5   French ex-patriots, when they left the site, how
6   did that, if in any way, affect or impact
7   Mr. Baker's position and his responsibilities?
8       A.    It greatly increased his
9   responsibilities as each ex-pat would leave.
10              Prior to him leaving each ex-pat would
11  basically sit down with Kevin Baker and release a
12  lot of technical information to Kevin to
13  basically learn whatever system that ex-pat was,
14  you know, trying to be a specialist on.
15      Q.    You testified before regarding alleged
16  promises to increase Mr. Baker's wages.
17              Did you have the authority to obligate
18  the company to pay an individual more money?
19      A.    No.
20      Q.    Much testimony has been about the
21  amount of hours that would have to be worked
22  during the course of a day.

Case 1:05-cv-01352-RCL    Document 32-4    Filed 01/20/2006    Page 16 of 16

Page 192

```
1           If you can tell me in, I guess, in a
2   general sense, why was it so critical, if it was
3   at all, for employees to work additional time
4   beyond what would normally be considered the
5   40-hour-per-week threshold?
6       A.   With the new technology that the
7   United States received with the high-horsepowered
8   locomotives from Amtrak in Maryland and the
9   high-speed train set, the job set in America was
10  only limited to the people that we hired for the
11  project, whether it was ex-pats or American.
12           So we basically, as ALSTOM, only had
13  the technology to troubleshoot the train.
14           The trains was -- for the project had
15  two situations you had to look at for the
16  project.  One of them was a penalty clause, which
17  was $10,000 a day per-trip penalty, that the
18  train had to be ready at a certain time or the
19  company would stand these financial penalties.
20           The other one is the safety
21  obligation, that in the rail transportation
22  industry that each individual employee and
```

MGB REPORTING, INC.
1-800-245-2528 or 301-983-9315